1  RYAN M. BEST, WSBA No. 33672
2  BEST LAW PLLC
   905 W Riverside, Suite 409
3  Spokane, Washington 99201
4  Telephone: (509) 624-4422
   Email: ryan.best@bestlawspokane.com
5

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

NOV 1 4 2017

SEAN F. McAVOY, CLERK
_____DEPUTY
SPOKANE, WASHINGTON

6  **UNITED STATES DISTRICT COURT**
   **EASTERN DISTRICT OF WASHINGTON**
7

8  UNITED STATES OF AMERICA ex
   rel. UPPI, LLC,
9
                                          No.  **2:17-CV-378-RMP**
10                                        **[SEALED]**
            Plaintiff-Relator,            **COMPLAINT PURSUANT TO**
11                                        **31 U.S.C. § 3730**

12     v.                                 **[DEMAND FOR JURY TRIAL]**

13
   CARDINAL HEALTH, INC.;
14 CARDINAL HEALTH 414, LLC d/b/a
   CARDINAL HEALTH NUCLEAR
15 PHARMACY SERVICES; CARDINAL
   HEALTH 200, LLC; D'S VENTURES
16 LLC d/b/a LOGMET SOLUTIONS,
17 LLC; CARING HANDS HEALTH
   EQUIPMENT & SUPPLIES, LLC;
18 OTHER UNNAMED SMALL
19 BUSINESS FRONT COMPANIES,
   OBIE B. BACON, and DEMAURICE
20 SCOTT, and UNNAMED
21 INDIVIDUALS (DOES)
22
23          Defendants.
24

25
26
27
28

[SEALED] COMPLAINT PURSUANT TO 31 U.S.C §
3730 AND DEMAND FOR JURY TRIAL - 1

I.      INTRODUCTION...................................................................5

II.     LEGAL FRAMEWORK..........................................................9

        A.      Parties.                                                        9

        B.      Jurisdiction and Venue.                                        12

        C.      The Applicable Laws.                                           13

                1.      The Federal False Claims Act                           13

                2.      The Anti-Kickback Statute                              14

        D.      Applicable Laws Aimed at Helping Small Businesses        15

        E.      Applicable Laws Aimed at Helping Veterans               20

                1.      The Veterans Entrepreneurship and Small
                        Business Development Act of 1999.....................21

                2.      The Veterans Benefit Act of 2003 .....................22

                3.      The Military Reservist and Veteran Small Business
                        Reauthorization and Opportunity Act Of 2008..............24

        F.      Requirements to Obtain Certification as A SDVOSB        24

                1.      The Rule of Two: The Supreme Court
                        Kingdomware Decision...................................29

                2.      Fraud on the VA is Given Heightened Attention in
                        the Current Administration –It's a Top Priority for
                        Enforcement ..........................................32

III.    ALLEGED FRAUDULENT SCHEME ...........................................33

        A.      Summary.....................................................33

        B.      Unlike Caring Hands and Logmet, Nuclear Pharmacies
                Are Highly Specialized and Regulated ......................38

        C.      These SDVOSBS Are Acting as Front Companies for
                Cardinal Health............................................44

1.   Caring Hands.................................................... 52

2.   Logmet ............................................................. 56

3.   Cardinal Health – SDVOSB Fraudulent
     Partnership   Scheme.................................... 59

D.   Cardinal Health Made Further False Statements About Its
     and Front Companies' LEU Capabilities in the Award of
     Contracts................................................................... 63

E.   Scienter: Defendants Knowingly Violated the False
     Claims Act ................................................................ 68

     1.   Cardinal Health Knowingly and Fraudulently
          Exploited the Government's Preference for
          Awarding Contracts to SDVOSBs................................... 69

     2.   Cardinal Health Fraudulently Triggered the Rule
          of Two ............................................................................. 72

     3.   When Challenged, the VA Terminated Contract
          Awards with Caring Hands and Logmet......................... 74

F.   Federal Trade Commission Previously Sanctioned
     Cardinal Health for a Similar Fraudulent Scheme .................. 78

G.   Materiality:  The Wrongdoing Alleged Was Material to
     The Government's Decision to Award the Contracts and
     Pay the Claims............................................................... 80

H.   H.  Defendants Fraudulently Induced the Government to
     Award Contracts for Dangerous Radio-Pharmaceutical
     Products Administered to Patients To Unqualified and
     Unlicenesed "Front Companies."................................ 83

IV.   DAMAGES AND PENALTIES ..................................................... 85

V.   COUNTS OF COMPLAINT ........................................................... 90

COUNT I                                                                   90

COUNT II                                                                  90

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT III                                                                 91

COUNT IV                                                                  92

COUNT V                                                                   93

COUNT VI                                                                  94

VI.    JURY DEMAND ........................................................................ 96

## COMPLAINT

COMES NOW, UPPI, LLC ("UPPI" or "Relator"), through the undersigned attorneys, on behalf of the United States of America, and files this *qui tam* Complaint against Defendants Cardinal Health, Inc. and its related entities ("Cardinal Health"), Caring Hands Health Equipment & Supplies LLC ("Caring Hands"), D's Ventures LLC d/b/a Logmet Solutions LLC ("Logmet"), Obie B. Bacon, DeMaurice Scott, and unnamed individuals ("Does") (collectively "Defendants"), and alleges as follows:

## I.   INTRODUCTION

1.     Since at least 2013, Defendants conspired to fraudulently obtain government contracts involving highly dangerous and sensitive radiopharmaceutical products. A radiopharmaceutical can be used for either diagnostic or therapeutic purposes. Radioactive materials are regularly used to treat medical conditions, diagnosis pathology, and visualize and measure physiological functions. Specifically, Defendants caused contracts to be awarded to SDVOSB "front companies" that were unlicensed and unqualified to handle these dangerous products that were administered to people. In doing so, they abused government programs designed to help disabled veterans and encourage small business development.

2.     In a nutshell, Fortune 500 company Cardinal Health (large publicly-

traded company) paired with one or more small businesses, including Caring Hands and Logmet, in the solicitation and ultimate award of highly specialized contracts for the manufacture and distribution of radiopharmaceutical products. Cardinal Health had an interest in becoming affiliated with these small business partners because of their status as "Service-Disabled Veteran-Owned Small Businesses" ("SDVOSBs") to gain an unfair and illegal advantage in obtaining government contracts that it would otherwise not have been entitled or able to obtain. Put another way, these SDVOSB partners were the "front companies" for Cardinal Health. Cardinal Health was so confident in this scheme that it engaged in these type of fraudulent arrangements with multiple small businesses.

3.    The government contracts were supposed to be awarded by the United States Department of Veterans Affairs ("VA") to businesses that could manufacture, market and distribute nuclear pharmaceuticals, a highly-specialized and highly-regulated practice area. That's what Congress wanted. In several instances, the contracts were explicit small business set asides for SDVOSBs. In other instances, the contracting officers or officials responsible for the award and administration of these contracts sought to award unrestricted contracts to SDVOSBs to meet contracting quotas. In either instance, Cardinal Health improperly used the SDVOSB partner to gain an advantage in the bid solicitation process.

4.    The purpose behind the Service-Disabled Veteran-Owned Small

[SEALED] COMPLAINT PURSUANT TO 31 U.S.C §
3730 AND DEMAND FOR JURY TRIAL - 6

Business ("SDVOSB") program is obvious. Such businesses are supposed to be exactly what their name suggests—service-disabled-veteran owned. In this case, the small business and the big company fraudulently gained an unfair advantage over other smaller businesses, contrary to what Congress intended. The small businesses (Caring Hands and Logmet) did not have the expertise, qualifications or certifications required to provide the highly-specialized services. Only the company worth billions (Cardinal Health) had the expertise to perform the work under the contract. The entire venture between the front companies and Cardinal Health was a sham to obtain radiopharmaceutical product contracts generally, and further to seek and obtain set aside contracts intended to help small nuclear pharmacies.

5.     Both Cardinal Health and the front companies gained financially from the scheme. Cardinal Health paid the front companies kickbacks in the form of a percentage mark-up on the contracts, and Cardinal Health effectively "won" the contracts as a behind the curtain subcontractor or partner, pocketing the remaining contract award and performing a majority of the work.

6.     In furtherance of this scheme, Defendants also misrepresented their capabilities of furnishing low energy uranium ("LEU") radiopharmaceutical products required by the VA contracts, and instead disbursed high energy uranium ("HEU") radiopharmaceutical products. Cardinal Health has been awarded over $300 million in radiopharmacy contracts with the VA since 2013. These

companies lied and conspired to get the contracts from the VA. This fraudulent scheme and conspiracy is ongoing.

7.    Cardinal Health and its front companies conspired for financial gain in violation of the False Claims Act. Other small specialty pharmacies, for which the small business designations were intended to support, naturally were harmed by this conspiracy.

8.    As the U.S. Small Business Administration ("SBA") states:

> Small businesses have always been the engine for economic growth. They provide jobs, innovation and bring competition to the marketplace. The Government's procurement policy – which encourages "maximum practicable" prime and subcontracting opportunities for small businesses – is a catalyst for economic growth. With a government contracting market representing more than a half trillion dollars, it makes solid economic sense to help small firms get their fair share of federal contract dollars.

U.S. Small Business Administration, Office of Government Contracting & Business Development, "Government Contracting 101, Part 1 – Small Business Contracting Programs: A Guide for Small Business," at 6 (January 2012), https://www.sba.gov/sites/default/files/files/Work%20book%20gc%20101%20part%201.pdf.

9.    As the SBA further states, "[s]mall business set-asides are a powerful tool for helping small businesses compete for and win federal contracts. . . . When market research concludes that small businesses are available and able to perform

the work or provide the products being procured by the government, those opportunities are 'set-aside' exclusively for small business concerns." U.S. Small Business Administration, "What is a Small Business Set-Aside?" https://www.sba.gov/contracting/government-contracting-programs/what-small-business-set-aside.

## II.    LEGAL FRAMEWORK

### A.    Parties.

10.    Relator UPPI is a membership organization and limited liability company, organized under the laws of the State of Delaware, and having at all times relevant to this action, its principal place of business in Suwanee, Georgia. UPPI promotes the business interests and manages the growth of its approximately eighty-seven (87) members, which are individual, small business, and university-based nuclear pharmacies engaged in the manufacturing, production, marketing, sales, and distribution of nuclear pharmaceuticals, including positron emission tomography ("PET") radiopharmaceuticals. UPPI is an organization dedicated to advancing the professionalism of the nuclear and PET pharmacy industries.

11.    Defendant Cardinal Health 414, LLC d/b/a Cardinal Health Nuclear Pharmacy Services, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Dublin, Ohio, and is a wholly-owned subsidiary of Cardinal Health Inc.    Cardinal Health 414

"manufactures, dispenses and delivers radiopharmaceuticals with expert efficiency to the highest regulatory standards."

12.    Defendant Cardinal Health 200 is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Dublin, Ohio, and is a wholly-owned subsidiary of Cardinal Health, Inc. that engages in the marketing of pharmaceutical preparations and medical equipment, instruments, and supplies.

13.    Defendant Cardinal Health, Inc., is a Top 15 Fortune 500 publicly-traded company, which also has its principal place of business in Dublin, Ohio. Defendant Cardinal Health is engaged in providing healthcare products to pharmacies, hospitals, and ambulatory care sites, including cold chain–refrigerated pharmaceutical tote packaging for pharmacy deliveries, franchise pharmacies, nuclear pharmacy services, specialty pharmaceutical distribution, and specialty pharmaceutical services. On its website, Cardinal Health represents itself as follows: "Headquartered in Dublin, Ohio, Cardinal Health, Inc. (NYSE: CAH) is a global, integrated healthcare services and products company, providing customized solutions for hospital systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide;" as a "$103 billion health care services company that improves the cost-effectiveness of health care." Its Chief Executive Officer is George S. Barrett. Cardinal Health may be served with

process through its registered agent for service of process, CT Corporation System, 1300 East Ninth Street, Cleveland, Ohio 44114.

14.    Cardinal Health and all its related-entities named in this Complaint are referred to collectively as "Cardinal Health."

15.    Defendant Caring Hands Health Equipment & Supplies, LLC ("Caring Hands") is a limited liability company, organized under the laws of the State of South Carolina, and having at all times relevant to this action, its principal place of business in Ridgeland, South Carolina. Caring Hands represents on its website that it is engaged in providing home healthcare services, supplying durable medical equipment ("DME") and government contracting. The company, through its owner and CEO, Obie B. Bacon, is certified as a SDVOSB, a Veteran Owned Small Business, and a Minority-Owned Small Business by the Small Business Administration. Caring Hands may be served with process through its registered agent for service of process, Obie B. Bacon, 61 Riverwalk Boulevard, Unit C, Ridgeland, South Carolina 29936.

16.    Obie B. Bacon is the Chief Executive Officer and owner of Caring Hands, together with his spouse, and formed the organization in 2009.

17.    Defendant D's Ventures, LLC d/b/a Logmet Solutions, LLC ("Logmet") is a limited liability company, organized under the laws of the State of Georgia, and having at all times relevant to this action, its principal place of business in McDonough, Georgia.    Logmet represents on its website that it

"provides one-stop single source purchasing for all your medical and dental products and supplies at competitive prices [offering] over 300,000 healthcare and dental manufacturer products." The company, through its owner and CEO, DeMaurice Scott, is certified as a SDVOSB, a Veteran Owned Small Business, and a Minority-Owned Small Business by the Small Business Administration. Logmet may be served with process through its registered agent for service of process, DeMaurice Scott, 301 Little Gem Ct, McDonough, GA 30253.

18.     DeMaurice Scott is the Chief Executive Officer and owner of Logmet.

19.     Other unnamed individuals (Does) may include contracting officers or other individuals who conspired to, or participated in the fraudulent scheme set forth in this Complaint, in violation of the False Claims Act.

**B.     Jurisdiction and Venue.**

20.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and 28 U.S.C. § 1331.

21.     Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) because one or more defendants may be found, resides, and/or transacts business in this District, or because an act, proscribed by 31 U.S.C. § 3729, occurred in this District.

## C.   The Applicable Laws.

### 1.   The Federal False Claims Act

22.    The False Claims Act provides, in part: Liability for Certain Acts.— (1) In general.—[  ] any person who— (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [ ] (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, [ ] is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(1)(A), (B), (G).

23.    Under the False Claims Act, scienter must be demonstrated: **Definitions—** For purposes of this section— (1) **the terms "knowing" and "knowingly"**— (A) mean that a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the

information; and (B) require no proof of specific intent to defraud; (2) **the term "claim"** —   (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that— (i)  is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; [] .  31 U.S.C. § 3729(b)(1)-(2).

### 2.    The Anti-Kickback Statute

24.    The Anti-Kickback Statute provides additional causes of action: (b) **Illegal remunerations**—(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind— (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care

program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.   (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person— (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. § 1320a-7b(b).

25.    (h)    **Actual knowledge or specific intent not required**—With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.   42 U.S.C. §1320a-7b(h).

### D.    Applicable Laws Aimed at Helping Small Businesses

26.    The federal government created a government contracting program known as the "small business set aside" to help small businesses compete for federal government purchases that amount in hundreds of billions of dollars for goods and services.

27.    The U.S. Small Business Administration states that "[w]hen market research concludes that small businesses are available and able to perform the work or provide the products being procured by the government, those opportunities are 'set-aside' exclusively for small business concerns." U.S. Small Business Administration Website, "What is a Small Business Set Aside?" https://www.sba.gov/contracting/government-contracting-programs/what-small-business-set-aside.

28.    Small business set asides are further refined into specific categories, including 8(a) business development programs, Women-Owned Small Businesses, Service-Disabled Veteran-Owned Businesses, and Small Mentor-Protégé Programs. 13 C.F.R. §§ 124.1 – 124.704 (8(a) business), 125.9 (mentor-protégé program), 125.11 – 125.33 (service disabled veteran), 127.100 – 701 (women-owned small business).

29.    These sub-categories of small business are identified, in part, as 8(a) small business development, women-owned small business ("WOSB"), and service-disabled veteran-owned small business programs ("SDVOSB"). *See id.*

30.    The 8(a)-small business development program is intended to help small, disadvantaged businesses including economically disadvantaged businesses and socially disadvantaged businesses (or minority owned businesses). 13 C.F.R. §§ 124.1, 124.101.

31.    The SDVOSB program is intended to allow federal agencies exclusive set asides for SDVOSBs and sole source awards to SDVOSBs if certain conditions are met.  13 C.F.R. §§ 125.8 – 125.10.

32.    As of the date of the enactment of the SBA in 1958, Congress required at least 23 percent of all federal government contracting dollars to be awarded to small businesses. 15 U.S.C.A. § 644 (g)(1)(A)(i).

33.    Since then, the federal government further stipulated that of that 23 percent, at least 5 percent must be awarded to small disadvantaged businesses and at least 3 percent must be awarded to service disabled veteran owned small businesses. 15 U.S.C.A. § 644 (g)(1)(A)(ii), (iv).

34.    The quota mandates became even more specific when the SBA established a process for negotiating and establishing agency specific quotas for each of these categories. 15 U.S.C.A. § 644 (g).

35.    For fiscal year 2017, the VA is required to award 28.5% of its contracts to prime small businesses and of that amount, at least five percent must be awarded to 8(a) disadvantaged businesses and three percent to SDVOSBs.  May 25, 2017 Memorandum from Secretary of Veterans Affairs concerning Fiscal Year (FY) 2017 Department of Veterans Affairs (VA) Socioeconomic Procurement Goals.

36.    When small businesses are awarded set-aside contracts in excess of $150,000, the small business is required to perform at least 50 percent or more of the work.

37.    Accordingly, the small business should be acting as the prime if the small business engages a subcontractor to perform some of the work. 13 C.F.R. § 125.6.

38.    Specifically, for service contracts, the small business prime contractor must provide at least 50 percent of the contract cost for personnel.

39.    On supply contracts, the small business prime must perform work for at least 50 percent of the cost of manufacturing the supplies, not including the cost of the materials, unless the small business prime qualifies as a non-manufacturer. 13 C.F.R. § 125.6(a)(1) – (a)(2).

40.    The non-manufacturer rule provides for small businesses to supply products that it did not manufacture by engaging in a subcontract pairing with another business.

41.    But the non-manufacturer rule still requires the subcontracting of work to another small business.

42.    More specifically, the specific criteria require that (1) the products must come from another domestic small business; and (2) the small business must take ownership and possession of the furnished items with its own personnel,

equipment or facilities, before the products are provided to the government agency. 13 C.F.R. § 125.6(a)(2).

43.    In short, a small business cannot subcontract 50% or more of the work to another entity unless that entity is another small business.

44.    The only exception to this rule is if the SBA issues a waiver. 13 C.F.R. §§ 121.406(b)(5), 125.6(a)(2).

45.    There are two types of waivers that can be issued – class waivers or individual waivers.  Those waivers cannot even be considered until after extensive market research and support that there is no small business manufacturer within the industry or individually who can meet the requirement of a specific contract solicitation.  13 C.F.R. §§ 121.406(b)(6), 121.1204.

46.    Based on information and belief, the SBA has not issued a class waiver for manufacturers of radiopharmaceutical products, and the SBA has not provided Cardinal Health with an individual waiver in the manufacture or distribution of radiopharmaceutical products.

47.    Subcontracting on small business contracts is permissible if small businesses adhere to the 50 percent thresholds, i.e., less than 50 percent of the work is subcontracted to another entity.

48.    When subcontracting, prime small businesses are not required to represent to the agency who awarded the contract that they are subcontracting

services pursuant to the contract, provided that they meet the aforementioned mandates. 13 C.F.R. § 125.3(b)(2); 13 C.F.R. § 121.404(g)(3)(ii).

49.    Specifically, prime small businesses are not asked to submit a formal subcontracting plan but are only "encouraged to provide maximum practicable opportunity to other small businesses to participate in the performance of the contract." 13 C.F.R. § 125.3(b)(2).

50.    Instead, it is only when specifically requested by the contracting officer when a small business prime may be required to submit a subcontracting plan, and only then if the contracting officer suspects a change in the contractor's status from small to other than small. 13 C.F.R. § 121.404(g)(3)(ii).

E.    **Applicable Laws Aimed at Helping Veterans**

51.    According to the third annual interagency Task Force on Veterans Small Business Development (Task Force) report, sent to President Barack Obama on October 16, 2015 ("the Task Force Report"), the United States has a strong interest in supporting veterans who want to start or acquire a business.

52.    Congress' sweeping enactment of legislation in roughly the last decade has been aimed at bolstering the economic need of veterans and veteran-owned small businesses including service-disabled veteran-owned small businesses.

53.    In supporting veterans and veteran-owned small businesses, the federal government is supporting the health of the United States economy.

54.    Congress enacted legislation with the view that the three main business development areas that veterans and veteran-owned small businesses need are: (1) access to technical assistance, including management assistance; (2) access to capital; and (3) access to federal contracting.

55.    In short, Congress had as its goal the empowerment of veterans through entrepreneurship.

56.    Congress recognized that veterans have been and continue to be vital to small business enterprises of the United States.

57.    The Task Force Report further explained that Congress determined that the United States has not done enough to assist veterans, particularly service-disabled veterans, in greater participation in the U.S. economy.

58.    Congress recognized that the nation must provide additional assistance and support to veterans who have taken great risks to serve our country.

59.    In response, Congress passed three pieces of legislation since 1999 to address concerns about the inadequacy of services to veterans and service-disabled veterans who either own or wish to start a small business, as set forth below.

1.    **The Veterans Entrepreneurship and Small Business Development Act of 1999**

60.    The Veterans Entrepreneurship and Small Business Development Act of 1999 (Public Law 106-50) expanded existing assistance and established new assistance for veterans who own or operate small businesses. It also made

provisions for general business loan programs, for assistance to active-duty military reservists, for creating disaster loan assistance to military reservists, and for the addition of veterans in a smaller-loan program.

61.    In the area of federal procurement, the 1999 law established an annual Government-wide goal that at least three (3) percent of the total value of all prime contract and subcontract awards be awarded to small businesses that are owned and controlled by service-disabled veterans. 15 U.S.C. § 644(g).

62.    In short, the 1999 law provided this assistance to veterans and service-disabled veterans:

> a)    Technical assistance:  SCORE program, entrepreneurship assistance, business development and management assistance for military reservists' small businesses
>
> b)    Financial assistance:  General business loan programs, assistance to active-duty military reservists, microloan program
>
> c)    Procurement assistance: subcontracting goal for participation in federal procurement

### 2.    The Veterans Benefit Act of 2003

63.    The Veterans Benefit Act of 2003 (Public Law 108-183) provided further assistance to veterans.  It gave veterans access to entrepreneur training and further allowed limiting competition to SDVOSBs for federal contracts. This Act, under Title III, provided for the following:

a)    Section 305 authorized state agencies to approve certain non-degree, non-credit entrepreneurship courses enabling or assisting veterans to start or enhance a small business.

b)    Section 308 amended the Small Business Act (15 U.S.C. 631, *et seq.*) establishing restricted competition and sole source authority on federal contracts for small businesses owned and controlled by service-disabled veterans.

c)    It specifically added a contracting mechanism to enable agencies to meet the three percent (3%) contracting goal. 15 U.S.C. § 657f. The Act permits a contracting officer to award a contract on a sole source basis to any small business concern owned and controlled by a service disabled veteran if: **(1)** the concern is determined to be a responsible contractor with respect to performance of such contract opportunity and the contracting officer does not have a reasonable expectation that two (2) or more small business concerns owned and controlled by service-disabled veterans will submit offers for the contracting opportunity; **(2)** the anticipated award price of the contract (including options) will not exceed — **(A)** $5,000,000, in the case of a contract opportunity assigned a standard industrial classification code for manufacturing; or **(B)**  $3,000,000, in the case of any other contract opportunity; and **(3)** in the estimation of the contracting

officer, the contract award can be made at a fair and reasonable price. 15 U.S.C. § 657f(a).  These restricted competitive procurements are referred to as Government "Set-Asides."

### 3.    The Military Reservist and Veteran Small Business Reauthorization and Opportunity Act Of 2008

64.    The Military Reservist and Veteran Small Business Reauthorization and Opportunity Act of 2008 (Public Law 110-186) further expanded veterans' small business opportunities.  It provided the following:

a)    Established the Interagency Task Force on Veterans Small Business Development.

b)    Authorized the permanent extension of SBA Advisory Committee on Veterans Business Affairs established by Public Law 106-50.

c)    Increased the number of Veterans Business Outreach Centers.

d)    Authorized provisions for Reservist Programs.

### F.    Requirements to Obtain Certification as A SDVOSB

65.    As indicated, the SDVOSB procurement program allows federal agencies to set acquisitions aside for exclusive competition among SDVOSB concerns.

66.    To be certified as a SDOVSB and, thus, to become eligible to bid on SDVOSB Set-Aside contracts, an entity must meet the following criteria:

a)      The Service Disabled Veteran must have a service-connected disability that has been determined by the Department of Veterans Affairs or Department of Defense, 15 U.S.C. § 632(q);

b)      The SDVOSB must be "small" under the North American Industry Classification System (NAICS) code assigned to the procurement;[1]

c)      The Service Disabled Veteran must unconditionally own 51% of the SDVOSB;

d)      The Service Disabled Veteran must control the management and daily operations of the SDVOSB; and

---

[1] The U.S. Small Business Administration ("SBA") uses the North American Industry Classification Systems ("NAICS") as a basis for its size standards. When the Federal government intends to acquire goods or services, it identifies the NAICS code that describes the principal purpose of that procurement. The NAICS classifies business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. economy. The NAICS industry codes define establishments based on the activities in which they are primarily engaged. NAICS codes are also used for administrative, contracting, and tax purposes. NAICS is production oriented (not product oriented) and categorizes businesses with others that have similar methods of production.

e)     The Service Disabled Veteran must hold the highest officer position in the SDVOSB.

67.    The SDOVSB must also comply with certain limits on subcontracting set forth at 13 C.F.R. § 125.6 (pre-June 30, 2016 Amendment):

a)     In the case of a contract for services, the SDVOSB must perform at least fifty (50) percent of the cost of the contract incurred for personnel with its own employees; or

b)     In the case of a contract for supplies, perform at least fifty (50) percent of the cost of manufacturing the supplies or products, not including the cost of materials.

68.    As of June 30, 2016, a SDVOSB awarded a contract under the "Small Business Set Aside" Program also must comply with the new Limitations on Subcontracting Rule ("LOS"), 13 C.F.R. § 125.6(a), which requires that:

a)     In the case of a contract for services (except construction), the SDVOSB may not pay more than fifty (50) percent of the amount paid to it by the Government to a subcontractor that is not similarly situated. 13 C.F.R. § 125.6(a)(1).

b)     In the case of a contract for supplies (other than from a non-manufacturer of such supplies), the SDVOSB may not pay more than fifty (50) percent of the amount paid to it by the Government to a subcontractor that is not similarly situated.  Costs of materials are

excluded and not considered to be subcontracted. 13 C.F.R. § 125.6(a)(2)(i).

69.    A similarly situated entity is a subcontractor with the same "small business program status as the prime contractor."

70.    Thus, for a SDVOSB prime contractor, a similarly situated subcontractor is a self-certified SDVOSB.

71.    In addition to sharing the same small business program status as the prime contractor, a similarly situated entity must be small pursuant to the NAICS code that the prime contractor assigned to the subcontract that the subcontractor will perform. 13 C.F.R. § 125.1.

72.    In the case of a contract for supplies valued at more than $25,000, where the SDVOSB is not the manufacturer of such supplies or performs less than fifty (50) percent of the cost of manufacturing the supplies, the SDVOSB may perform under the contract only if the SDVOSB partners with another U.S. based company, which is "small" under the applicable NAICS code. 13 C.F.R. §125.6(b)(4).

73.    If a subcontractor performs the "primary and vital requirements" of a contract, the contractor and subcontractor will be treated together as a joint-venture.

74.    If, however, the prime contractor is unduly reliant on the subcontractor, the two businesses can no longer be classified as "small" under the

applicable NAICS code and the SDVOSB may not continue to certify as "small" for that contract or for any task order under that contract. 13 C.F.R. § 121.103(h)(3).

75.   Companies that are contracting as SDVOSBs must be registered as a SDVOSB, and must certify to their SDVOSB status, whenever they submit a bid, proposal, application or offer for a Federal grant, contract, subcontract, cooperative agreement, or cooperative research and development agreement reserved, set aside, or otherwise classified as intended for award to SDVO SBCs, as follows:

> (1) Submission of a bid, proposal, application or offer for a Federal grant, contract, subcontract, cooperative agreement, or cooperative research and development agreement reserved, set aside, or otherwise classified as intended for award to SDVO SBCs.

> (2) Submission of a bid, proposal, application or offer for a Federal grant, contract, subcontract, cooperative agreement or cooperative research and development agreement which in any way encourages a Federal agency to classify the bid or proposal, if awarded, as an award to a SDVO SBC.

> (3) Registration on any Federal electronic database for the purpose of being considered for award of a Federal grant, contract, subcontract, cooperative agreement, or cooperative research and development agreement, as a SDVO SBC.

13 C.F.R. § 121.108.

76.   These regulations, representations, and certifications described in the preceding paragraphs are material to the Government's decisions to award

contracts and to pay the claims submitted under the contracts pursuant to the Government Set-Asides awarded.

### 1.    The Rule of Two: The Supreme Court Kingdomware Decision

77.    The Supreme Court recently decided a case concerning the award of contracts to SDVOSBs, clarifying and otherwise upholding a specific component of the Veterans Benefits, Health Care, and Information Technology Act of 2006, 38 U. S. C. §§8127, 8128, known as the "Rule of Two." *Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969, 1976 - 77 (2016).

78.    As previously stated, Congress enacted the Veterans Benefits, Health Care, and Information Technology Act of 2006 to set more specific annual goals that encourage contracting with veteran-owned and service disabled veteran-owned small businesses. 38 U.S.C. § 8127(a).

79.    The Act required that "a contracting officer of the Department [of Veterans Affairs] shall award contracts on the basis of competition restricted to small business concerns owned and controlled by veterans *if the contracting officer has a reasonable expectation that two or more small business concerns owned and controlled by veterans will submit offers and that the award can be made at a fair and reasonable price that offers best value to the United States*." 38 U.S.C. § 8127(d) (emphasis added). This mandate has become known as the "Rule of Two."

80.     Congress further provided for veteran owned business by further restricting competition to veteran owned businesses with two exceptions.

81.     Under these two exceptions, the VA may use noncompetitive and sole-source contracts when the contracts are below specific dollar amounts.

82.     Under §8127(b), the first exception provides that a contracting officer "may use procedures *other than competitive procedures*" to award contracts to veteran-owned small businesses when the goods or services that are the subject of such contracts are worth less than the simplified acquisition threshold (also known as "SAP awards"). 38 U. S. C. §8127(b)(emphasis added); 41 U. S. C. §134 (establishing a "'simplified acquisition threshold'" of $100,000); see also §1908 (authorizing adjustments for inflation); 75 Fed. Reg. 53130 (codified at 48 CFR §2.101 (2010)) (raising the amount to $150,000).

83.     Under 38 U. S. C. §8127(c), the second exception provides that a contracting officer "may award a contract to a [veteran-owned small business] using procedures *other than competitive procedures*" if the contract is worth more than the simplified acquisition threshold but less than $5 million, [and] the contracting officer determines that the business is "a responsible source with respect to performance of such contract opportunity," and the award can be made at "a fair and reasonable price." 38 U. S. C. §8127(c) (emphasis added).

84.     Kingdomware Technologies, Inc. was a service-disabled veteran-owned small business that challenged the VA's decision to award a contract to a

[SEALED] COMPLAINT PURSUANT TO 31 U.S.C §
3730 AND DEMAND FOR JURY TRIAL - 30

non-veteran owned company without restricting competition using the "Rule of Two," as required in 31 U.S.C. § 8127. *Kingdomware*, 136 S. Ct. at 1974 – 75.

85.    The Rule of Two requires that the VA cannot award a contract "without first checking to see whether at least two veteran-owned small businesses could perform the work at a fair and reasonable price." *Kingdomware*, 136 S. Ct. at 1975.

86.    The Court concluded that "§ 8127 unambiguously requires the Department to use the Rule of Two before contracting under the competitive procedures [requiring that] 'a contracting officer of the Department [Veterans Administration] *shall* award contracts' to veteran-owned small businesses using restricted competition *whenever the Rule of Two is satisfied*." *Kingdomware*, 136 S. Ct. at 1976-77 (emphasis added).

87.    Satisfaction of the Rule of Two requires that "the contracting officer has a reasonable expectation that two or more small business concerns owned and controlled by veterans [can and] will submit offers," based on market research and due diligence that two or more-small veteran owned businesses can act on the contract. 38 U.S.C. § 8127(d).

88.    The Court explained that "[t]he GAO issued a nonbinding determination that the Department's failure to employ the Rule of Two was unlawful and recommended that the Department conduct market research to

determine whether there were two veteran-owned businesses that could fulfill the procurement." *Kingdomware*, 136 S. Ct. at 1975.

89.    The Court further stated that "[o]n the merits, we hold that §8127 is mandatory, not discretionary. Its text requires the Department to apply the Rule of Two to *all contracting determinations* and to award contracts to veteran-owned small businesses. The Act does not allow the Department to evade the Rule of Two on the ground that it has already met its contracting goals or on the ground that the Department has placed an order through the FSS." *Kingdomware*, 136 S. Ct. at 1976 (emphasis added).

### 2.    Fraud on the VA is Given Heightened Attention in the Current Administration –It's a Top Priority for Enforcement

90.    On May 2, 2017, President Trump issued Executive Order 13,793, entitled "Improving Accountability and Whistleblower Protection at the Department of Veterans Affairs." Executive Order 13, 793, Volume 82, No. 83, Part II (May 2, 2017).

91.    The Order recognized that the VA needed additional support in ferreting out problems at the VA with employees, contracting officers and managers "who ha[d] violated the public's trust and failed to carry out his or her duties on behalf of veterans."

92.    The Order created a new office within the VA to assist the VA Secretary in encouraging and resolving whistleblower complaints about wrongdoing at the VA without fear of retaliation or other adverse action.

93.    The Order recognized that there are problems within the VA concerning wrongdoing that may undermine the very purpose of the agency and the public's trust in its support and oversight of veterans' affairs.

94.    The Order mandates that the VA, in conjunction with this whistleblower office, "work closely with relevant VA components to ensure adequate investigation and correction of wrongdoing," and "ensure swift and effective resolution" of complaints.

95.    Those concerns can be similarly voiced here in certain contracting officials' conduct (or lack thereof) when evaluating the propriety and capability of the defendant SDVOSBs' solicitations for these highly specialized radiopharmaceutical contracts.

### III.    ALLEGED FRAUDULENT SCHEME

A.    Summary.

96.    UPPI brings this action on behalf of the United States of America against Defendants to recover damages and civil penalties as a result of Defendants' violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA").

97.    Specifically, Defendants defrauded the United States by engaging in arrangements in which Small Businesses ("SBs") and/or SDVOSBs would bid on, and win Government contracts as prime contractors when such contracts were designated as "Small Business Set-Asides" or otherwise awarded preferentially, based on the owner's status as a small business and a veteran. These contracts primarily included, *inter alia*, contracts awarded by the VA for nuclear pharmaceuticals, which these prime small businesses ("PSMs"), including Caring Hands and Logmet, did not perform, and, in fact, could not have performed.

98.    Instead, Cardinal Health, doing business as Cardinal Health Nuclear Pharmacy Services, and these PSMs entered into agreements whereby these contracts would largely, if not entirely, be performed by Cardinal Health.

99.    Contrary to the SBA's intent that small businesses perform at least 50 percent of the work, 13 C.F.R. § 125.6, in these arrangements, the small business prime contractors (or front companies) performed or are performing a *de minimis* amount of work because they cannot satisfy the contract requirements for radiopharmaceutical products or services.

100.    Neither Caring Hands, nor Logmet, have the necessary licensure, personnel, facilities, equipment, or skill to provide radiopharmaceutical products or services to VA pharmacies.

101.    Instead, these front companies have to pair with Fortune 500 companies like Cardinal Health to perform on these radiopharmaceutical contracts.

102.  Pairing or partnering on small business set aside contracts is not categorically prohibited but there are clear specifications on how it can be done. *E.g.*, 13 C.F.R. §§ 125.8, 125.18(b).

103.  The SBA is clear that in both service and supply contracts, "the small business prime contractor must provide at least 50% of the contract cost for personnel" or "perform work for at least 50% of the cost of manufacturing the supplies, not including the cost of materials." U.S. Small Business Administration, "What is a Small Business Set-Aside: Subcontracting Limitations; *see also* 13 C.F.R. § 125.6(a)(1) – (a)(2).

104.  In the event that the small business prime does not itself manufacture the product, the product must still only be supplied by another small business. U.S. Small Business Administration, "What is a Small Business Set-Aside: Subcontracting Limitations"; *see also* 13 C.F.R. § 125.6(a)(1) – (a)(2).

105.  The size of a business – whether it is considered "small" pursuant to SBA regulations – is determined by the NAICs code affiliated with that line of business. 13 C.F.R. § 121.201.

106.  NAICs stands for North American Industry Classification System and is the standard used by the federal government in classifying business establishments.

107.  These VA contract solicitations use the NAICs code 325412, which is defined as pharmaceutical preparation manufacturing. 13 C.F.R. § 121.201.

108.   The SBA has established a threshold of the number of employees that a small business soliciting contracts for pharmaceutical preparation manufacturing with NAICS code 325412 must not exceed, which is 1,250. 13 C.F.R. § 121.201.

109.   Cardinal Health 414, LLC has 3,000 employees and Cardinal Health, Inc. has 37,300 employees.

110.   Neither qualify as "small businesses" for contracts with NAICS code 325412.

111.   Cardinal Health, which is a Top 25 Fortune 500 company and not a SM or SDVOSB, defrauded the United States by using these PSMs to obtain these radiopharmaceutical contracts under false and fraudulent pretenses, while concealing or causing to be concealed its role in performing the contracts.

112.   In exchange for using its SM and SDVOSB status to bid on and win contracts under the "Small Business Set Aside" Program, these PSMs retained an agreed upon percentage of the proceeds that was characterized as "overhead."

113.   In exchange for performing the contracts that it was barred from obtaining and performing, and concealing that it had obtained and performed the contracts by fraud, Cardinal Health received the rest of the proceeds.

114.   At all times, Defendants knew that the contracts fraudulently awarded to these PSMs, based, in part on their SM and SDVOSB status, would not be performed in accordance with the Veterans Benefit Act of 2003 and the "Small Business Set Aside" Program.

115.   Defendants knowingly made, used, and caused to be made or used, false records and statements material to false and fraudulent claims for payment, in that, *inter alia*, Caring Hands and Logmet falsely certified and Cardinal Health caused to be falsely certified, that Caring Hands and Logmet could and would perform the contracts, and, in particular, that Caring Hands and Logmet were licensed to perform the contracts, in violation of 31 U.S.C. § 3729(a)(1)(B).

116.   Defendants further conspired to submit and caused to be submitted false claims, and to make, use and cause to be made and used false records and statements material to false and fraudulent claims, *to wit,* that Caring Hands and Logmet had performed the contracts as required by and in compliance with the "Small Business Set Aside" Program and federal regulations, in violation of 31 U.S.C. § 3729(a)(1)(C).

117.   Individuals and businesses that seek to do business with the United States must be honest and forthright in their dealings with the United States. The same is true for individuals and businesses that apply for federal contracts, particularly those contracts that are set aside to benefit veterans. The United States should especially safeguard programs aimed at benefitting Small Businesses and Service-Disabled Veteran-Owned Small Businesses.

## B.    Unlike Caring Hands and Logmet, Nuclear Pharmacies Are Highly Specialized and Regulated

118.    Nuclear medicine is a highly regulated field.  As described by the Nuclear Regulatory Commission, "[b]ecause of their potentially hazardous properties, the use of certain radioactive materials must be closely regulated to protect the health and safety of the public and the environment." (U.S. Nuclear Regulatory Commission website, https://www.nrc.gov/about-nrc/radiation/protects-you/reg-matls.html)

119.    The oversight required for the manufacture, distribution and practice of nuclear medicine derives from the highly specialized nature of nuclear medicine.

120.    Nuclear medicine refers to medicine (a pharmaceutical) that is attached to a small quantity of radioactive material (a radioisotope). This combination is referred to as a "radiopharmaceutical," or "nuclear pharmaceutical."

121.    Radiopharmaceuticals target specific organs or cellular receptors, while external detectors capture the radiation emitted from the radiopharmaceutical as it moves through the body in order to generate an image. Diagnosis is based on the way the body is known to handle substances in the healthy state versus a diseased state.

122.   Radiopharmaceuticals, or nuclear pharmaceuticals, are highly regulated by multiple federal, state, and local agencies.

123.   The Nuclear Regulatory Commission ("NRC") has authority to license and regulate the possession, use, and disposal of nuclear by-product materials, including nuclear pharmaceuticals.  The NRC licenses and regulates the use of nuclear by-product materials directly in twenty-one (21) states, and has transferred that authority to state regulatory agencies in twenty-nine (29) states ("the Agreement States"). Thus, under the current regulatory scheme, either the NRC or an Agreement State agency regulates the production, distribution, use of, and disposal of radiopharmaceuticals in a given locale, including by licensing nuclear pharmacists.

124.   As a result, nuclear pharmacies and nuclear pharmacists who handle radiopharmaceuticals must be highly specialized and are required to meet specific and stringent requirements.

125.   The NRC acts on a specific regulatory scheme that governs the issuance of licenses and administration of radiopharmaceuticals to ensure that any person or entity that may manufacture, produce, acquire, receive, possess, prepare, use or transfer byproduct material for medical use may only do so in accordance with a specific license issued by the NRC or an Agreement State.  10 C.F.R. § 35.1, *et seq*.

126. Individual nuclear pharmacists must first be licensed by their state boards of medicine and pharmacy before they can apply for authorization from the NRC or from an Agreement State agency to produce, distribute or use nuclear pharmaceuticals as a nuclear pharmacist.

127. In order to be licensed by the NRC or an Agreement State agency as a nuclear pharmacist, a pharmacist must:

> (a)(1) have graduated from an accredited pharmacy program; (2) hold a current, active license to practice pharmacy; (3) have acquired at least 4000 hours of training/experience in nuclear pharmacy practice; and (4) pass an examination in nuclear pharmacy; *or*

> (b)(1)(i) have completed 700 hours in a structured education program consisting of 200 hours of classroom and laboratory training in (A) radiation physics and instrumentation; (B) radiation protection; (C) mathematics pertaining to the use and measurement of radioactivity; (D) chemistry of byproduct material for medical use; and (E) radiation biology; and (ii) supervised practical experience in a nuclear pharmacy involving (A) shipping, receiving and performing radiation surveys; (B) using and performing checks for proper operation of instruments; (C) calculating, assaying, and safely preparing dosages for patients; (D) using administrative controls to avoid medical events in the administration of byproduct material; and (E) using procedures to prevent or minimize radioactive contamination; and (2) obtained written attestation from a preceptor authorized nuclear pharmacist that the requirements have been met.

10 C.F.R. § 35.55.

128.   Similarly, in order to provide radiopharmaceuticals to government agency pharmacies like VA pharmacies, a distributor must be licensed, either by the NRC and/or by the Agreement State, to produce, distribute and use radiopharmaceuticals for human administration.  10 C.F.R. § 35.55

129.   South Carolina, for example, is an Agreement State.   Agreement States, have entered into agreements with the NRC that give them the authority to license and inspect byproduct, source, or special nuclear materials used or possessed within their borders.

130.   Any applicant, other than a Federal agency or Federally recognized Indian tribe, who wishes to possess or use licensed material in one of these Agreement States must contact the responsible officials in that State for guidance on preparing an application.

131.   These applications must be filed with State officials, not with the NRC.

132.   At least 38 of Caring Hands' contracts awarded by the VA for the delivery of nuclear pharmaceuticals were awarded in Agreement States (including South Carolina as mentioned above, Alabama, Florida, North Carolina, and Texas).

133.   Radiopharmaceuticals are not only regulated by the NRC and Agreement States, but also by the U.S. Food and Drug Administration ("FDA").

134.   On December 11, 2011, FDA established requirements in 21 C.F.R. Part 212 for the manufacturing of PET radiopharmaceuticals[2] in accordance with Current Good Manufacturing Practices ("cGMP") which require firms manufacturing and distributing these drugs to submit either a New Drug Approval ("NDA") or Amended Drug Approval ("ADA") to the FDA for approval.

135.   Accordingly, the VA made explicit mandatory requirements for those contractors furnishing radiopharmaceutical products and services.

136.   The VA contracted with Caring Hands and Logmet to manufacture and distribute single unit doses of radiopharmaceuticals and associated materials, including all necessary supplies and packaging, to various VA pharmacies across the country.

137.   First, the VA required that these PSMs "shall provide copy of NRC licensure with their bid." Further, the VA required that "[b]idders/offerors should thoroughly review the specifications and be familiar with the area of coverage prior to submitting their bid/offeror in order to be fully aware of the supplies and services required." (VA Radiopharma Contracts ("Scope of Work"))

---

[2] Positron emission tomography ("PET") is a nuclear medicine, functional imaging technique that is used to observe metabolic processes in the body. The system detects pairs of gamma rays emitted indirectly by a positron-emitting radionuclide (tracer), which is introduced into the body on a biologically active molecule.

138.   Second, the VA required that the "[c]ontractor shall provide all labor, compounding, supervision, and transportation necessary to provide daily deliveries to the Department of Veterans Affairs," at the respective pharmacy location.

139.   Third, the VA contracted with these PSMs to perform the necessary quality control procedures and meet all the Nuclear Regulatory Commission, Department of Transportation, FDA, OSHA, and other relevant agency rules and regulations specific to the manufacture and distribution of radiopharmaceuticals.

140.   Fourth, the VA required that the awardees of these contracts "be regularly established in the business that is called for," and "are able to show evidence of the reliability, ability, experience, equipment, facilities, and personnel directly employed or supervised by them to render prompt and satisfactory service."

141.   Fifth, the VA required that "[s]upplies shall be handled in accordance with Vendor's Licensing and NRC Regulations."

142.   Sixth, the VA required that the "[v]endor shall be responsible for proper disposal/removal of radioactive waste materials or make clear its intention of requiring the VA Medical Centers nuclear medicine service line to dispose and remove."

143.   Seventh, the VA required that "[a] licensed Radiopharmacist shall be available for consultation inquiries, via telephone during normal duty hours, Monday through Friday, 7:00 am to 5:00 pm."

144. Eighth, the VA required that "[a]ll radiopharmaceuticals supplied by the Vendor shall meet Food and Drug Administration (FDA) and Nuclear Regulatory Commission (NRC) standards for sterility, freedom from pyrogens and contaminants, and radiochemical integrity."

145. Ninth, the VA required that "[i]n the event a quality control or material defect is suspected and/or detected by a VA Nuclear Medicine Technologist, the Vendor will be requested to provide any consultation necessary to alleviate any said suspicion and/or defect by the following: (i) provide technical expertise in calibration; (ii) provide professional examination of product, submit recommendation to Contracting Officer; (iii) make expedient replacement of any product suspected of being deficient."

146. The VA solicitations clearly and repeatedly mandated that contract awardees be licensed and have the capability to properly distribute and otherwise handle these highly specialized and regulated radiopharmaceutical products.

**C.    These SDVOSBS Are Acting as Front Companies for Cardinal Health**

147. These front companies have fraudulently won numerous radiopharmaceutical contracts in partnership with defendants, which are not small businesses and are not entitled to those contracts either alone or as a venture with these front companies.

148.    The SDVOSB primary contractor does not own, nor have expertise or training in radiopharmaceutical preparation and is not licensed for radiopharmacy or radiation safety protection operations and the safe handling of the radioactive product, according to U.S. and State regulations to protect the patient, the public and the environment.

149.    A Fortune 15 company, with 163 radiopharmacies in the 50 states, is the largest single owned radiopharmacy in the competitive space and knows it should stand as its own entity for the bidding/providing of radiopharmaceutical services.

150.    The VA awarded these front companies multiple contracts for the distribution of certain radiopharmaceuticals and related services in Government-owned and operated healthcare facilities because they were SDVOSB and Small Business Set Aside contracts.

151.    In addition, the VA and other federal agencies awarded numerous other unrestricted contracts that required the furnishing of radiopharmaceutical products and related services to Caring Hands to help meet the federal mandate of a three percent quota of contract awards to SDVOSBs.

152.    Referenced above, under the 1999 law, at least three percent of the total value of all prime and subcontract awards are required to be awarded to SDVOSBs.  15 U.S.C. § 644(g).  Presumably, the contracting officer is expected to

assess whether the SDVOSB could, in fact, perform under the contract before blindly awarding the contract to the entity *because* it is a SDVOSB.

153.  Here, neither of these front companies were entitled to any of those contracts because neither of these front companies are qualified to perform the highly specialized work required by the radiopharmaceutical contracts.

154.  Neither of these front companies are licensed by the NRC or by an Agreement State to possess, use, process, export, and import, nuclear materials and waste, to handle certain aspects of their transportation, or to conduct radiation safety programs for the protection of its employees, the public, or the environment.

155.  Neither of these front companies are licensed to manufacture or handle radiopharmaceuticals or are licensed to operate as a nuclear pharmacy or PET pharmaceutical manufacturer under the FDA current Good Manufacturing Practices (cGMP).

156.  Neither of these front companies could properly prepare doses of these highly dangerous/sensitive radiopharmaceutical products for shipment, including proper storage, shipment, transport, and delivery of these radioactive materials as required by safety standards and the U.S. Department of Transportation.

157.  Neither of these front companies had the certification, expertise, or personnel to properly handle and dispose of waste and used materials, consistent with prescribed safety standards.

158.  When these contracts are awarded, the VA expected the proper, prompt and accurate distribution of highly sensitive radiopharmaceutical products.

159.  Neither of their websites include any listing or specific reference to licensed nuclear pharmacists among its employees.

160.  Neither of these front companies maintain the facilities, staff, or expertise to produce, manufacture, transport, or provide radiopharmaceuticals in accordance with NRC/Agreement State, the State Boards of Pharmacy, and/or cGMP regulations.

161.  In fact, Caring Hands' principal place of business is one unit in a strip mall.

162.  Logmet's only business address is 301 Little Gem Court, McDonough, Georgia 30253, which is a single-family home residence.

163.  Neither of these front companies had a "manufacturing radiation safety officer," responsible for ensuring the safety and compliance of dispensing radiopharmaceutical products.

164.  Neither of these front companies have the capability to operate in multiple jurisdictions.

165.  Neither of these front companies could meet the explicit regulations and inspection requirements of the Nuclear Regulatory Commission.

166.  The NRC provides specific instruction about the requirements of radiopharmaceutical manufacturers, suppliers, and distributors to ensure that

"radiopharmaceuticals are being conducted in a manner that will protect the health and safety of workers and the general public [and] are conducted in accordance with USNRC or AS requirements."

167.    Yet, the VA awarded contracts to both of these front companies in various jurisdictions that are at times, thousands of miles away from where the front company is located.    There is no evidence that these front companies were performing any services in those far and away jurisdictions.

168.    Even if you were to assume that these front companies could perform some nominal service, because they hold no qualifications in the area of nuclear pharmacy, that work would be limited to prescription order taking or invoicing.

169.    The prescription order forms include numerous fields of information such as patient name, the drug type, order amount, the dosage, and the physician, among other fields.

170.    The prescription form is completed in real-time in the pharmacy and is physically attached to the barrel of the syringe that contains the radioactive pharmaceutical drug.

171.    Simultaneous with completing the prescription form, an invoice must be completed that includes all the same information as the prescription order form.

172.    Both the prescription order form and the invoice are based on the actual prescription the radiopharmacist receives at the time the drug must be filled.

173.    The radiopharmacist is the only qualified person who can ensure that the amount, dosing, and actual drug dispensed is accurate.

174.    Similar to any pharmacy practice, the turnaround time between when the prescription is given to the pharmacy and ultimately filled for the patient can be as quick as two hours or less.

175.    This work cannot be completed remotely or electronically from another location.

176.    In a majority of the contracts awarded to Caring Hands and Logmet, the dispensing pharmacy was located in a different state from where those front companies' principal places of business.

177.    There is also no indication or proof that they are performing either of these services.

178.    Moreover, the security of such patient information being exchanged between the VA pharmacy and these front companies in an electronic or other form is questionable and may give rise to violations of the Health Insurance Portability and Accountability Act or HIPAA that provides for data privacy and security to safeguard patients' medical information.

179.    These VA pharmacies could not have sent prescriptions to these sham front companies with protected health information without a properly executed Business Associate Agreement (BAA) pursuant to HIPAA.

180.    These SDVOSBs did not execute any BAAs.

[SEALED] COMPLAINT PURSUANT TO 31 U.S.C §
3730 AND DEMAND FOR JURY TRIAL - 49

181.  Both of these front companies falsely certified to the Government that they are licensed to possess, use, process, export, manufacture, or import nuclear materials and waste and/or handle certain aspects of their transportation, and, thus, able to perform contracts for nuclear pharmaceuticals awarded under the "Small Business Set Asides" Program.

182.  Contrary to the SBA's intent that small businesses perform at least 50 percent of the work, 13 C.F.R. § 125.6, in these arrangements, the small business prime contractors (or front companies) are performing a de minimis amount of work because they cannot furnish radiopharmaceutical products or services.

183.  Instead, these front companies have to necessarily pair with Fortune 500 companies like Cardinal Health to perform on these radiopharmaceutical contracts.

184.  Indeed, a GE Healthcare representative who manufactures and distributes these radiopharmaceutical products confirmed that Cardinal Health has some kind of "internal arrangement" with Caring Hands when another SDVOSB accused GE of pairing with Caring Hands who was not a licensed radiopharmacy.

185.  The GE Healthcare representative stated in email:

> To attempt to answer your question, I will say it is my understanding CaringHands is a subsidiary or exclusive agent of Cardinal Health [CH]. I'm sure they have some specific arrangement to have CH to service their [sic] all of their contracts, which is an arrangement between CaringHands and CH and has nothing to do with GE. We sell to CH, who has distribution rights to GE and

> many other products, including contrast media and devices, and there is likely a contract between those entities. We do not contract with CaringHands, only Cardinal Health.

Email from James Kaufman, GE Healthcare Executive Global Leader, to Perry Polsinelli, Mystic Ventures Owner (August 26, 2015).

186. Pairing or partnering on small business set aside contracts is not categorically prohibited but there are clear specifications on how it can be done.

187. In the event that the small business prime does not itself manufacture the product, *the product must still only be supplied by another small business* ("non-manufacturer rule"). 15 USC § 637(a)(17); 13 C.F.R. § 121.406 (emphasis added).

188. The size of a business – whether it is considered "small" pursuant to SBA regulations – is determined by the NAICs code affiliated with that line of business. 13 C.F.R. § 125.1.

189. These VA contract solicitations use the NAICs code 325412, which is defined as pharmaceutical preparation manufacturing.

190. The SBA has established a threshold of the number of employees that a small business soliciting contracts for pharmaceutical preparation manufacturing with NAICS code 325412 must not exceed, which is 1,250.

191.   Cardinal Health 414, LLC has 3,000 employees and Cardinal Health, Inc. has 37,300 employees.   Neither qualify as "small businesses" for contracts with NAICS code 325412.

192.   The SBA also contains provisions that allow the Administrator of the SBA to waive this requirement when there are no small business manufacturers or processors available to supply the product to the Federal Government.

193.   Here, UPPI's 87 members represented at least 87 small business manufacturers or processors who had the necessary license and could have properly fulfilled all the contractual requirements to supply these radiopharmaceutical products pursuant to these VA contracts.

### 1.    Caring Hands

194.   According to its website, Caring Hands has ten employees, has a principal place of business in Ridgeland, South Carolina, and has won over $85 million in federal contracts over the last several years.

195.   On its registration page with the System for Award Management or SAM, Caring Hands identifies eight "plant" location addresses.   Each location lists Obie Bacon as the owner, and identifies the owner address as the location in Ridgeland, South Carolina.   None of these locations appear to have the capability to function as a radiopharmaceutical supplier, distributor, or processor.

196.   Caring Hands' primary place of business as advertised on the website is in Ridgeland, South Carolina.

197.   Caring Hands then lists eight other purported places of business in South Carolina, Georgia, and Alabama.

198.   The first location listed on the SAMs website is at 3516 South Live Oak Drive, Suite E, Moncks Corner, South Carolina 29461.   The address is in a strip mall shopping center.

199.   The second location listed on the SAMs website is 1240 First Street South Extension, Suite D, Columbia, SC 29201.   Again, this location is in a strip mall shopping center location and appears to be a storage facility.

200.   The third location listed on the SAMs website is at 2215 9th Avenue, Suite B, North Port, AL 35475., which appears to be a storage unit that does not appear to have the capability to house highly toxic radiopharmaceutical products that require refrigeration.

201.   The fourth location listed on the SAMs website is at 109 Troup Street Bldg., Dublin, GA 31021. The building simply has automobile bays to store and wash vans.   There is no product that is (or could be) stored at this location.

202.   The fifth location listed on the SAMs website is at 2740 Apple Valley Rd NE, Atlanta, GA 30319 and is identified as the "Brookhaven Self Storage Unit."   It similarly appears to be a storage facility or warehouse that could not house or store any radiopharmaceutical products.

203.   The sixth location listed on the SAMs website is at 3105 Spring Grove Drive, Suite C-3, Augusta, GA 30906 and is identified as "Dean's Bridge

Industrial Park Space for Lease Facility." It again appears to be a storage facility or warehouse that could not house or store any radiopharmaceutical products.

204.    The seventh location listed on the SAMs website is at 812 Oliver Court, Montgomery, AL 36117. This location also appears to be another storage facility that could not house or store any radiopharmaceutical products.

205.    The eighth location listed on the SAMs website is at 621 Graymont Avenue, Birmingham, AL 35203. Once again, the location is a warehouse that leases space and does not appear to house any retail, manufacturing, or office space. Once again, the location does not appear to be able to house or store any radiopharmaceutical products.

206.    From 2013 to the present, Caring Hands solicited and was awarded *at least* 14 contracts and numerous modifications on those contracts (Contract ID Numbers: VA24614D0022; VA24614J0473; VA24615J0044; VA24715P1634; VA24714C0365;    VA24815D0013;    VA24815J0210;    VA24815J1387; VA24815J1468;    VA24815J2352;    VA24814D0216;    VA24815J0203; VA25717D0008; VA25717J0143; in addition to the multi-year contract options applicable to some contracts) for a total of 38 contract terms to provide radiopharmaceuticals to the VA for a total contract award amount of over $5.9 million. (Caring Hands Updated Radiopharmaceutical Contract Awards)

207.  At least 14 of the contracts identified above were awarded as "sole source" or "simplified acquisition" awards based on Caring Hands' status as a SDVOSB and/or Small Business and were excepted from open competition.

208.  All of the contracts required the contract awardee to manufacture, distribute and deliver radiopharmaceutical supplies

209.  Caring Hands could not perform on these contracts because Caring Hands did not have the mandated radiopharmacy licensure, personnel, or vehicles.

210.  First, Caring Hands is not licensed with the Nuclear Regulatory Commission or with an Agreement State and is not regularly established in the business of providing radiopharmaceuticals.

211.  Second, Caring Hands does not have the required personnel to perform the work or render the necessary quality control procedures.

212.  Third, Caring Hands' delivery vans provide no indication that they safely transport radioactive pharmaceuticals and bear no warning or precautions that the vans transport those types of pharmaceuticals.  Properly certified vehicles include refrigerated units and bear explicit radioactive symbols because of the dangerous and potentially toxic substances the vehicle is transporting.

213.  Fourth, Caring Hands' principal place of business in South Carolina is a 300-square foot office space with no indication or appearance for pharmaceutical repackaging or dispensing, let alone radiopharmaceutical processing.

214.   Fifth, Caring Hands was awarded contracts in cities nowhere near a Caring Hands location.   Putting aside the fact that all of the Caring Hands' locations looked like sham store fronts, even if one were to assume they were legitimate enterprises, those "places of business" were nowhere near the twelve contracts or modifications awarded to Caring Hands to furnish radiopharmaceutical products to VA pharmacies in the Miami, Florida region in the amount of over $3,500,000.

215.   Caring Hands also was awarded an additional 56 contracts or contract modifications from the VA and other federal agencies to furnish medical equipment and supplies in South Carolina, Kentucky, Georgia, Alabama, and Connecticut.

216.   UPPI has reasonable suspicion that Caring Hands is likely not performing a majority of the work, if any, on those contracts.

217.   Caring Hands did not and could not have performed at least fifty (50) percent of the cost of the contract incurred for personnel with its own employees, and did not and could not have performed at least fifty (50) percent of the cost of manufacturing the supplies or products.

### 2.   Logmet

218.   Logmet certified its principal place of business as 301 Little Gem Court, McDonough, Georgia 30253, which is a single-family home residence.

219. In its System for Award Management or SAM registration, Logmet certified that it does not intend to use any other plants or facilities located at a different address than this single-family residence in the fulfillment of its contract award.

220. Over the last 3 years Logmet has certified in its SAM Registration that the contractor consists of "1 employee" and "annual revenue of $1."

221. Logmet advertises, however, that it "offer[s] over 300,000 medical and dental supplies, equipment, products and devices to meet[] your organizational needs."

222. Further, Logmet certifies that it can fulfill contracts that require highly specialized and varied services from cutting and sewing apparel to radiopharmaceutical manufacturing and preparation.

223. The VA awarded Logmet six radiopharmaceutical contracts or contract modifications in 2016 and 2017 for a total contract award amount of approximately $465,000.

224. The six contracts list the principal places of performance in Massachusetts, New Mexico, and Georgia.

225. All six contract awards were SDVOSB set aside or sole source contract solicitations.

226. Other federal agencies including the Centers for Disease Control and Prevention and the Department of the Army have also awarded Logmet

approximately eight contract awards or modifications for radiopharmaceutical products for total contract award amounts of over $9.9 million.

227.   One of the places of business for those other agency contracts is Croatia.

228.   Logmet does not advertise any place of business in Croatia.

229.   Logmet could not perform on these contracts because Logmet did not have the mandated radiopharmacy licensure, personnel, or vehicles.

230.   First, Logmet is not licensed with the Nuclear Regulatory Commission or an Agreement State and is not regularly established in the business of providing radiopharmaceuticals.

231.   Second, Logmet does not have the required personnel to perform the work or render the necessary quality control procedures.

232.   Third, Logmet's principal and only identified place of business in Georgia is a single-family residence with no indication or appearance for pharmaceutical repackaging or dispensing, let alone radiopharmaceutical processing.

233.   Fourth, Logmet was awarded contracts in locations nowhere near its single-family residence address in Georgia.

234.   Logmet also was awarded an additional 56 contracts or contract modifications from the VA and other federal agencies to furnish medical

equipment and supplies in Mississippi, Missouri, Utah, New Mexico, Colorado, Massachusetts, Texas, Florida, Louisiana, Ohio, and Georgia.

235.  UPPI has reasonable suspicion that Logmet is likely not performing a majority of the work, if any, on those contracts.

236.  Logmet did not and could not have performed at least fifty (50) percent of the cost of the contract incurred for personnel with its own employees, and did not and could not have performed at least fifty (50) percent of the cost of manufacturing the supplies or products.

237.  Defendants knowingly submitted, caused to be submitted, and conspired to submit false claims for payment to the Government, in violation of the FCA.

### 3.    Cardinal Health – SDVOSB Fraudulent Partnership Scheme

238.  To perform on these contracts, Caring Hands and Logmet entered into agreements with Cardinal Health under which Caring Hands and Logmet would bid on both Small Business Set-Aside and unrestricted contracts for the provision of nuclear pharmaceuticals.  The expectation was that Cardinal Health would, in fact, perform on the contracts.

239.  To encourage Caring Hands and Logmet to engage in this partnership or "team" arrangement, Cardinal Health paid these sham front companies a percentage fee share from the total contract award.

240.    The kickback or remuneration paid to Caring Hands, for instance, was so significant that Caring Hands declared an annual revenue of $61.7M in 2014.

241.    In 2014, Caring Hands still only had 11 employees and was run by Obie Bacon and his wife.

242.    Other than bidding on and obtaining the contracts as SDVOSBs, Caring Hands' and Logmet's only responsibilities under the contracts was to submit the claims for payment in order to make it appear that Caring Hands had performed the contract and to conceal that Cardinal Health had actually performed the contract.

243.    By contrast, Cardinal Health performed a majority of the work.

244.    Cardinal Health could perform all the work required under these contracts because Cardinal Health operates "the largest radiopharmaceutical network in the United States."

245.    As of October 2016, Cardinal Health, Inc. was ranked #15 on the list of Fortune 500 companies, with more than $102.5 billion in revenue and more than $1.2 billion in profits.

246.    Cardinal Health did not bid on, and was not awarded, the contracts at issue and was neither eligible for, nor entitled to receive, any benefits under SDVOSB Set-Asides, sole source, or simplified acquisition awards.

247.    Instead, Cardinal Health and Caring Hands used Caring Hands' and Logmet's preferred status as SDVOSBs to obtain Government contracts

fraudulently, knowing that neither Caring Hands nor Logmet could perform the contracts and that Cardinal Health was ineligible to bid on the contracts.

248. Moreover, Cardinal Health furnished the warranty for all the radiopharmaceutical products transported and disbursed pursuant to the these sham SDVOSB contract awards.

249. Because these radiopharmaceutical products are highly dangerous substances, the VA pharmacy solicitations require that the contract awardee insure its services with a warranty. (VA Contract Solicitation No. VA247-15-Q-0193 (Birmingham Contract) at Section E.1 52.212-1(b) (Instructions to Offerors – Commercial Items) ("Submit signed and dated offers to the office specified in this solicitation . . . [a]s a minimum, offers must show – (5) Terms of any express warranty."))

250. Cardinal Health similarly understood the importance of warranties in the provision of these products.

> Cardinal Health warrants to customer that the pharmaceutical products prepared or compounded by Cardinal Health shall, upon delivery, be free from defects in material and workmanship caused by Cardinal Health. Customer must promptly notify the dispensing pharmacy of any alleged defect. The exclusive remedy under this warranty shall be the replacement of the defective product or the refund of the purchase price paid for the defective product, at cardinal health's option. **Cardinal Health Disclaims all other warranties, express or implied, including any warranty of merchantability.** Cardinal Health does not warrant pharmaceutical products manufactured by others and provided to

customer without preparation or compounding by Cardinal Health, but Cardinal Health hereby assigns to customer the manufacturer's warranties to the extent such warranties are assignable. Cardinal Health shall not be liable for indirect, special, incidental, or consequential damages, whether under contract or in tort, arising out of its performance under this agreement.

Cardinal Radiopharmaceutical Supply Agreement at para.12.

251. None of these sham SDVOSBs, including namely Caring Hands and Logmet, have warranties, and, if they did, the warranties would be false statements.

252. UPPI engaged the radiology department at the Durham, Virginia VA facility after they awarded a radiopharmaceutical contract to Caring Hands.

253. In particular, UPPI representatives spoke with Jim Stanfield, who is the VA Chief Tech at that location. Although the contract was awarded to Caring hands, Stanfield informed UPPI that he was pleased with the work Cardinal Health was performing on the contract.

254. When the UPPI representative stated that the contract had been won by Caring Hands, not Cardinal Health, Stanfield became quiet and said that the UPPI representative would need to speak to the VA contracting officer because Stanfield was simply the end user.

255. The contracting officer on the Durham, Virginia radiopharmaceutical contract was Olin Newsome.

256. UPPI representatives understand that Newsome may have a personal relationship with Obie Bacon.

257. On LinkedIn, Newsome endorsed the skill set of an Economically Disadvantaged Women Owned Small Business owner, Nikita Davis.

258. The U.S. Attorney's Office in the District of Columbia successfully prosecuted Davis for a fraudulent contract procurement scheme, and she was sentenced to twenty months in prison on October 20, 2017.

259. These contracts were not performed in accordance with Small Business and/or SDVOSB performance standards, by Caring Hands or Logmet. The contracts were performed by Cardinal Health.

260. For all claims for payment submitted pursuant to the fraudulently awarded contracts after June 30, 2016, Cardinal Health was not "similarly situated" much less properly "small" for the NAICS code assigned to the contracts, which were performed in violation of the LOS.

**D.    Cardinal Health Made Further False Statements About Its and Front Companies' LEU Capabilities in the Award of Contracts**

261. The Government has made it a national priority to reduce and protect vulnerable nuclear and radiological material located at civilian sites worldwide, including by converting research reactors and isotope production facilities, from the use of high energy uranium ("HEU") to low energy uranium ("LEU").

262. On January 2, 2013, Congress passed the American Medical Isotope Production Act of 2011, P.L. 112-239, to promote the production of molybdenum-

99 ("Mo-99"), the parent nuclide of Tc-99m, with non-HEU or LEU in the United States.

263.    Mo-99 is produced in nuclear research reactors using *either* HEU *or* LEU.

264.    For Tc-99m to be in compliance with the non-HEU requirement, however, *both* the uranium targets and the uranium fuel used to produce Mo-99, must be comprised of LEU.

265.    It is not, therefore, technically acceptable to use HEU in any of the processes to produce the medical isotopes, if the Mo-99 (and Tc-99m) are to qualify as derived from LEU; *the entire process from the reactor to the imaging center must use only LEU.*

266.    The Centers for Medicare and Medicaid Services in its effort to assist in the elimination of highly enriched uranium created reimbursement code Q9969 and requires >95% LEU.

267.    On January 3, 2014, the Under Secretary of Health for the VA, Dr. Robert Pretzel sent a Memorandum to Network Directors at the request of The White House Interagency Policy Committee regarding the preferential procurement of non-High Enriched Uranium-Derived Medical Isotopes to improve national security and eliminate HEU medical isotopes that are a risk to nuclear proliferation.

268.    The January 3, 2014 Memorandum stated:

(1) The White House Interagency Policy Committee has requested that the Department of Veterans Affairs (VA) preferentially procure medical radioisotopes from non-High Enriched Uranium (HEU) sources. The reason for this request is that transportation and storage of HEU by radioisotope vendors may be a security and nuclear proliferation risk. VA's leadership in the transition to non-HEU radioisotope production will improve national security, promote the creation of domestic suppliers of medical radioisotopes, and will ultimately reduce the United States' reliance on foreign sources. In support of this important initiative, I am asking you to purchase non-HEU derived isotopes when they become commercially available.

***

(3) As a point of clarification, VA does not purchase uranium. The radioisotope vendors purchase uranium to generate Tc-99m. Whether Tc-99m is made with HEU or non-HEU, the radioisotope is the same. Therefore, transition to a non-HEU vendor will not otherwise affect your operations.

(4) Please notify all Veterans Health Administration Veterans Integrated Service Network Chief Medical Officers, Quality Management Officers, Chiefs of Staff, and facility nuclear medicine staff to begin preferential procurement of Tc-99m produced from non-HEU sources as adequate supplies become available.

269. On March 28, 2016, a second preferential procurement from the Under Secretary of Health for the VA, Dr. David J. Shulkin, was sent to Network Directors further reiterating that many radioisotopes vendors have converted to LEU operations.

270. The March 28, 2016 Memorandum stated:

(1) Many radioisotope vendors have converted to Low Enriched Uranium (LEU) operations, thus reducing the United States' reliance on foreign sources. In 2014, my office encouraged you to purchase radioisotopes from vendors using LEU sources. I am reminding you of our commitment and encouraging you to expand preferential purchases to the greatest extent practical.

***

(3) Currently, about 20 percent of VA medical centers purchase Tc-99m from radioisotope vendors using LEU sources. Since 2012, the number of vendors has increased. Each year, vendors should be surveyed for LEU capability via sources sought request. Our practice must be to solicit Tc-99m as LEU capability emerges.

271. Consistent with the VA Under Secretary memos, most if not all of the VA contracts at issue here required the provision of radioisotopes from non-Highly Enrichment Uranium (non-HEU) or LEU sources.

272. More to the point, the solicitations at issue here unequivocally required non-HEU (LEU) Tc-99m: "**6.8 *** Tc-99M REQUIREMENT FOR ALL VA MEDICAL CENTERS: <u>Tc-99m to be produced by the low enriched uranium method only.</u>***"** VA Solicitation No. VA258-15-N-0559, Phoenix Nuclear Medicine – Radio-pharmaceuticals 5 yr. IDIQ (6-22-2015).

273. The VA is required to determine whether the proposal meets technical acceptability requirements.

274. Technical acceptability under this solicitation requires the successful contractor to be capable of providing non-HEU Tc-99m doses to the Nuclear Medicine Departments on a daily consistent and reliable basis.

275. Cardinal Health acknowledged that the entire radiopharmaceutical industry needed to convert 100 percent of its product to non-HEU. Cardinal Health Disclosure, December 21, 2012.

276. Indeed, Cardinal Health is the largest nuclear pharmacy company in the United States with 163 locations. (Cardinal Health website)

277. As of November 8, 2017, less than 10 percent of those locations have >95% non-HEU Mo99 generator product every working day of the month.

278. In 40 of 77 UPPI member pharmacies supply LEU - the government mandated radioisotope that replaces HEU - on a consistent and uninterrupted basis.

279. Even if Cardinal Health properly won any of these contracts, Cardinal Health procured the contract on at least the false pretense that it could furnish the mandated non-HEU product when, in fact, it could not.

280. Cardinal Health's false representation of its LEU capabilities in the solicitation and award of VA contract awards renders all those contract award payments false.

281. Neither Cardinal Health, nor any of the sham SDVOSBs it used as fronts, could acquire, possess and supply the necessary non-HEU product raising

concerns about the manner in which those procurements were conducted and the VA's commitment to patient safety and nuclear safety.

E.    **Scienter: Defendants Knowingly Violated the False Claims Act**

282.    Cardinal Health's primary interest in pairing with these PSMs as subcontractors was to gain an unfair advantage in the award of these contracts.

283.    Cardinal Health engaged in these agreements with full knowledge that the PSMs could not perform much of any work under the contract and certainly could not act on 50 percent or more of the contract service and supply obligations.

284.    Instead, Cardinal Health intended to hide behind the small business designations of Caring Hands and Logmet and capitalize on the federal and judicial mandates for preferential contract awards to small businesses and, in particular, SDVOSBs.

285.    Cardinal Health's opportunistic and intentionally misleading conduct meant that the VA, at times, did not even realize that it was Cardinal Health performing on the contract under the cloak of a SDVOSB's sham storefront.

286.    Relator believes that Cardinal Health has and continues to use other SDVOSBs as front companies to trigger and ultimately win government agency contract awards with the intent to perform a majority of the work on the contracts.

287.    Pairing and otherwise hiding behind SDVOSBs gives Cardinal a competitive advantage and almost exclusivity in the radiopharmacy market it already dominates based on its size.

1. **Cardinal Health Knowingly and Fraudulently Exploited the Government's Preference for Awarding Contracts to SDVOSBs**

288.   At least twenty of the contracts awarded to Caring Hands and Logmet were small business or SDVOSB set asides, meaning that Cardinal Health could not have been awarded those contracts and should not have performed more than 50% of the work on those contracts.

289.   For the rest of the contract awards, Defendants fraudulently took advantage of the legislative, executive, and judicial pressure to meet small business quotas.

290.   In all of those instances, Defendants were clearly violating SBA mandates and laws intended to help small businesses, and, particularly, service disabled veteran owned small businesses.

291.   The VA pharmacies and contracting officers would afford preference to SDVOSB entities competing for contract awards in the radiopharmaceutical context because of pressure they felt in meeting the Congressionally mandated quotas and what they understood as a court ordered mandate in the Supreme Court *Kingdomware* decision.

292.   On May 24, 2017, UPPI representatives attended the HealthConnect Reverse Expo in Atlanta, GA -- a forum for commercial vendors of radiology and IT products and services -- to meet with federal agency representatives tasked as purchasing agents for radiopharmacies like the hundreds maintained by the VA.

293.   UPPI representatives spoke with Mr. Hollis A. Tessmer, II, a business manager and technical director of imaging services at the Charlie Norwood VA Medical Center in Augusta, GA.

294.   UPPI representatives were inquiring about if and how the VA was fulfilling the preferential procurement memoranda of LEU (or non-HEU) medical isotopes.

295.   Tessmer confessed to having no knowledge of a non-HEU preference in nuclear pharmacy contracting and instead asked the UPPI representatives if they were aware of the Supreme Court *Kingdomware* decision.

296.   Tessmer then explained that in order to win a VA radiopharmaceutical solicitation, UPPI members would need to partner with SDVOSBs.

297.   UPPI representatives again spoke with Tessmer at the HealthConnect Radiology Imaging Conference in Chicago, IL on October 20, 2017.

298.   Tessmer again encouraged the small business members of UPPI to pair with a SDVOSB to win VA contract awards, and specifically referred UPPI representatives to Thomas Childers, who formerly operated an SDVOSB and could otherwise help other businesses with this scheme.

299.   Childers' SDVOSB was called Heritage Resource Group with DUNS 963383257 and a business address that was a residence in Cumming, GA.

300.   Tessmer explained that when contracting officers are aware of a SDVOSB bidder for a particular contract, there is no competitive process or choice

as to the winning bid.    The SDVOSB is awarded the contract automatically because of pressure felt from *Kingdomware*.

301.    Tessmer explained that while the SDVOSB may be the prime contractor in name, the SDVOSB is simply a pass through for a different entity to actually perform the work.

302.    Tessmer implied that this type of sham arrangement works in the small business subcontracting arena because there is no obligation on a prime small business to submit any formal subcontracting plan.

303.    Tessmer explained that the SDVOSB is paid 10 – 20 percent of the contract award for acting as a pass through.

304.    When UPPI asked how the unqualified SDVOSB can be awarded these highly specialized radiopharmaceutical contracts, Tessmer responded that the SDVOSB can represent that it has a nuclear pharmacy license because the SDVOSB is in a joint venture with a licensed entity.

305.    Tessmer acknowledged that the SDVOSB is not doing any of the work and is only being used for the actual contractor to "check a box," and further acknowledged the possible impropriety of the business venture stating that "you gotta be in bed with this individual.  This has got to be somebody you trust."

306.    Tessmer further acknowledged that Cardinal Health may be engaged in this game acting as the larger licensed conglomerate behind the SDVOSB prime stating, "It's a game.  Cardinal may not be playing the game very well.  Yet they're

a huge conglomerate. It doesn't take much, you just got to play the game," and have the ability to "check a box."

307. Under no uncertain terms, Tessmer was informing UPPI (with a wink and a nod) that SDVOSBs, irrespective of, and in fact, because of their lack of qualification or capability to render these radiopharmaceutical services, were given preferential treatment and ultimately, awarded these contracts because the VA was aware that a larger conglomerate would actually perform the contract services.

## 2.    Cardinal Health Fraudulently Triggered the Rule of Two

308. But partnering with sham front SDVOSBs was not enough to guarantee Cardinal Health a contract award.

309. Cardinal Health needed to trigger the Rule of Two particularly if the contract was unrestricted.

310. If Cardinal Health was able to show the contracting officer that there were at least two SDVOSBs who intended to bid on the contract solicitation, the Rule of Two would be triggered ensuring that at least one of those two SDVOSBs would be awarded the contract.

311. In reality, there were never two or more SDVOSBs who were qualified to submit bids for these radiopharmaceutical contracts because there were never two or more SDVOSBs who had the necessary licensure, staff, facilities, or equipment to furnish these highly specialized, radioactive products.

312.   Indeed, there were often no SDVOSBs who could perform this work.

313.   But that did not stop Cardinal Health on fraudulently capitalizing on a rule that contracting officers felt compelled to act upon and restrict competition for these highly specialized contracts.

314.   Through this fraudulent scheme, Cardinal continues to restrict competition and maintain a monopoly on the nuclear pharmacy market.

315.   Cardinal learned of all the SDVOSBs who were attempting to appear competent, licensed, and qualified to distribute radiopharmaceutical products through a simple search on the "Interested Business Vendor List" published on the VA Department website.

316.   The "Interested Business Vendor List" is where businesses self-certify their area of expertise and qualifications by NAICS Codes and self-certify their business type, including SB and SDVOSB, among other types of business certifications.

317.   Cardinal may have initially discovered Caring Hands and Logmet from this list.

318.   Cardinal likely learned of another SDVOSB -  Standard Medical Equipment Systems, LLC ("Standard Medical") – that self-certified that it was an SDVOSB with expertise and personnel qualified in the business of radiopharmaceutical products (NAICS Code 325412) on an Interested Business Vendor List for a given contract.

319.    Like Caring Hands and Logmet, Standard Medical was not qualified to furnish these highly specialized services.

320.    Standard Medical advertises itself as a "certified minority (MBE) Veteran (SDVOSB) owned company" established by Anthony B. Goodesmith in 2005 "to deliver high quality medical devices and laboratory equipment.

321.    Standard Medical has one page indicating that it can offer radiopharmaceuticals.

322.    Standard Medical has a principal place of business at 8160 Maple Lawn Blvd, Unit #500, Fulton, MD 20759.

323.    That place of business appears to be an office suite.

324.    Although Standard Medical was referenced on multiple radiopharmaceutical solicitations as an interested business vendor, it did not win any of those contracts.

325.    Standard Medical may have accepted remuneration from Cardinal Health to be another SDVOSB that would trigger the application of the rule of two and compel the contracting officer to ultimately award the contract to a sham SDVOSB acting on behalf of Cardinal Health like Caring Hands or Logmet.

### 3.    When Challenged, the VA Terminated Contract Awards with Caring Hands and Logmet

326.    To the extent Cardinal Health claims there was any confusion or ignorance as to these PSMs' capabilities, the VA on at least three occasions upheld

protests filed by UPPI members and withdrew or terminated contract awards to Caring Hands and Logmet.

327.   In September 2016, Shertech Pharmacy Charlotte, LLC, a UPPI member, filed a pre-award protest against the Department of Veterans Affairs Multiple Delivery Sites of Care in North Carolina including W.G. Hefner VA Medical Center, Salisbury, NC; Charlotte Health Care Center, Charlotte, NC; and Kernersville Health Care Center, Kernersville, NC pursuant to Solicitation No. VA 246-16-Q-1208.

328.   Shertech Pharmacy is a small, woman-owned business, which is headquartered in Charlotte, North Carolina, and is a properly licensed entity that furnishes radiopharmaceutical products.

329.   Solicitation No. VA 246-16-Q-1208 was for the manufacture and distribution of radiopharmaceuticals used for diagnostic imaging services and functional studies of organs (identified with NAICs code 325412) and was a 100 percent small business set aside for SDVOSBs.

330.   In submitting its pre-award protest on August 18, 2016, Shertech stated that it was unreasonable to set aside the contract for a SDVOSB when there was no SDVOSB who held the proper licensing to provide the necessary services within the required logistical area of the VA pharmacies.

331. Shertech specifically noted that the SDVOSBs listed on the Interested Vendors List for this Solicitation "were not companies that could perform the services requested."

332. In particular, Shertech stated "that the companies on the Interested Vendors List are not licensed to receive, possess, manufacture, prepare radiopharmaceuticals combining Tc-99m with the radiopharmaceutical ligand, perform quality control," among other deficiencies.

333. Most notably, Shertech informed the Contracting Officer that none of the listed SDVOSBs possessed the necessary NRC licensure.

334. Because the radioactive material used for individual patient doses are very short- lived (majority have 6-hour half-lives), the dispensing pharmacy must be within about a two-hour radius of the Nuclear Medicine department otherwise the radiopharmaceuticals "would be significantly deteriorated to an unusable dosage strength."

335. The contracting officer for Solicitation No. VA 246-16-Q-1208 responded on September 6, 2016 stating that "[t]here is no actual solicitation at this time (still in the pre-solicitation phase); however, there are no plans to change the set-aside requirement at this time." Email from D. Hurlock (VA Contracting Officer) to K. Sheriff (Shertech Pharmacy representative), Re: Salisbury VA Radiopharmaceuticals VA 246-16-Q-1208, dated September 6, 2017.

336.   After a month and likely because of the protest, the contracting officer (D. Hurlock) temporarily suspended the new radiopharmaceutical product solicitation for the Salisbury VA Medical Center and extended the contract to the original awardee, Shertech Pharmacy, through a contract modification.

337.   UPPI representatives filed a similar pre-award protest against the SDVOSB set aside on Solicitation No. VA 246-14-Q-0483 to furnish the same radiopharmaceuticals to a Fayetteville VA Medical Center in Fayetteville, VA. The contracting officer in that instance removed the SDVOSB designation and changed the contract to a small business set aside solicitation.

338.   In a third instance, on July 16, 2015, the Comptroller General from the General Accountability Office (GAO) issued a decision in a VA radiopharmacy bid protest filed by a small business radiopharmaceutical business, Triad Isotopes, Inc., finding that the "Rule of Two" was improperly applied when awarding the contract to a SDVOSB.

339.   Specifically, the decision found that "the agency's market research was insufficient to conclude that the agency would likely receive quotations from at least two responsible small business concerns that could meet the requirements in the RFQ at a fair market price, and therefore the agency's decision to restrict the solicitation to small business concerns was unreasonable."

340.    In short, the GAO found that there were not two or more SDVOSBs qualified to meet the radiopharmaceutical contract requirements in that region, and thus, it was wrong to restrict competition by triggering the Rule of Two.

341.    In a fourth instance, the VA terminated a contract award to Logmet in New Mexico after Senator Martin Heinrich, on behalf of a UPPI member, raised concerns about Logmet subcontracting the radiopharmaceutical work required in the contract to a large business.

342.    UPPI understood that large business to be Cardinal Health.

343.    In all four of these protests, when UPPI members raised concerns and otherwise explained that the SDVOSBs, who are competing and ultimately awarded these contracts, are unqualified for the contract awards, the VA recognized these concerns as valid and withdrew or terminated the contract awards.

**F.    Federal Trade Commission Previously Sanctioned Cardinal Health for a Similar Fraudulent Scheme**

344.    In April 2015, the Federal Trade Commission filed a complaint against Cardinal Health seeking injunctive and other equitable relief, including disgorgement, *see FTC v. Cardinal Health*, Case No. 15-cv-3031 (S.D.N.Y. Apr. 20, 2015).

345.    The FTC complaint alleged that Cardinal Health illegally monopolized 25 local markets, including Spokane, Washington, for the sale and

distribution of radiopharmaceuticals and forced hospitals and clinics to pay inflated prices for the drugs. *See id.*

346.   The FTC complaint explained that from 2003 through 2008, Cardinal Health used a variety of tactics to ensure that the manufacturers would not disburse their radiopharmaceuticals to any new competitors in those markets. *See id.*

347.   The FTC concluded:

> This conduct allowed Cardinal to maintain and exercise monopoly power in each of the relevant markets. By excluding potential rivals, Cardinal denied its customers the benefits of competition and profited from the monopoly prices it charged for all radiopharmaceuticals, including HPAs, in the relevant markets. Importantly, there was no efficiency benefit or legitimate business justification.

Statement of the Federal Trade Commission, In the Matter of Cardinal Health, Inc., FTC File No. 101-0006 (April 17, 2015).

348.   Cardinal Health settled those allegations on or about April 20, 2015 for $26.8 million and was ordered to restore competition in six markets where Cardinal Health remains the dominant radiopharmacy. *See* FTC Press Release, "Cardinal Health Agrees to Pay $26.8 Million to Settle Charges it Monopolized 25 Markets for the Sale of Radiopharmaceuticals to Hospitals and Clinics, April 20, 2015, https://www.ftc.gov/news-events/press-releases/2015/04/cardinal-health-agrees-pay-268-million-settle-charges-it.

349. Cardinal Health is continuing to monopolize the radiopharmacy market but behind the cloak and protection of SDVOSBs.

**G.    Materiality:  The Wrongdoing Alleged Was Material to The Government's Decision to Award the Contracts and Pay the Claims**

350. The conduct alleged in this Complaint is material as that term is defined under the False Claims Act.  The – "term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property" – under the False Claims Act.

351. The focus of this materiality inquiry is "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."

352. This inquiry can be undertaken from either the perspective of  a reasonable person or the particular defendant:  a matter is material (1) if a reasonable person would attach importance to it in determining a choice of action in the transaction; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining a choice of action, regardless of whether a reasonable person would do so.

353. The defendants presented (or caused to be presented) false claims, or made (or caused to be made) false statements material to a claim, under the False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq.*, by setting up a sham venture

whereby a billion-dollar company used a front company in order to improperly obtain contracts intended for a SB or SDVOSB-qualified business.

354.   Had the Government known that front company was not performing at least 50 percent of the work under the contract, it would not have awarded these contracts, thus, the materiality standard under the False Claims Act has been met.

355.   No reasonable person would conclude that the Government would not attach importance to a misrepresentation regarding the company's eligibility for contracts expressly and exclusively reserved for SBs and SDVOSBs that perform at least 50 percent of the work under the contract.

356.   To the extent that Government contracting officers were indifferent to the alleged fraud set forth in this Complaint, or stuck their head in the sand, or had actual knowledge or conspired to commit the fraud, they were acting without authority.

357.   Congress made express its intent regarding the materiality of any misrepresentations, as alleged in this Complaint, made by a contractor when bidding on a contract solicitation that was either explicitly a SB or SDVOSB set aside or implicitly intended for a SDVOSB pursuant to the Rule of Two.

358.   Congress mandated that such a contractor "shall be subject to" civil prosecution under the FCA under 15 U.S.C. § 637(m)(5), and as applied expressly to SDVOSBs under 15 U.S.C. § 657f(d) ("Enforcement; penalties").

> *"(C) Penalties In addition to the penalties described in section*
> *645(d) of this title [15 U.S.C.], any small business concern that is*
> *determined by the Administrator to have misrepresented the status of*
> *that concern as a small business concern owned and controlled by []*
> *[service-disabled veterans] for purposes of this subsection, shall be*
> *subject to—*
>
> > *(i) section 1001 of title 18; and*
> >
> > *(ii) sections 3729 through 3733 of title 31 [**the False Claims***
> *Act].*"

359. It is a material misrepresentation under the False Claims Act by the contractor-defendant that it satisfied the 50 percent requirements for federal program contracts because the Government's money would never have been paid to defendant had the Government's agents known the 50 percent requirements had been flouted and not met. Such an undisclosed fact was material because no one can say with reason that the Government would have signed this contract if informed of the likelihood of the undisclosed fact. The Government's money would never have been obligated towards the contracts had its agents known the contractor was not properly qualified or intending to do 50% or more of the work when it bid on the contracts and no one can say with reason that the Government would have entered the contracts if informed of the undisclosed fact that the contractor was not properly qualified or intending to do 50% more of the work.

H.    H.    **Defendants Fraudulently Induced the Government to Award Contracts for Dangerous Radio-Pharmaceutical Products Administered to Patients To Unqualified and Unlicenesed "Front Companies."**

360.    To subvert and defeat Congress' goal to award contracts to qualified small businesses such as Plaintiff's members, Defendants made false statements calculated to further enrich the global large business of Cardinal Health.

361.    Cardinal Health, a large global business, orchestrated a scheme to fraudulently induce the award of contracts, based on the false statement that there were at least two or more qualified "SDVOSBs" which were licensed and qualified to handle these dangerous substances.  In fact, it was Cardinal Health waiting in the wings to fraudulently obtain the contracts once the "Rule of Two" was invoked.

362.    Defendants thus fraudulently induced VA to apply the "Rule of Two," and thus to award the contracts in the name of the unlicensed and unqualified SDVOSBs, rather than to qualified small businesses that could handle these dangerous products safely.

363.    In violation of legal requirements ensuring the integrity of small business contracting, Defendants misrepresented and concealed that the "front companies" did little if any of the work.  The result was that legitimate, qualified small businesses lost these contracts because of the fraud of Cardinal Health and the other defendants in fraudulently inducing he award of these contracts.

364. It is well-established that when a party receives a federal contract as a result of a material misrepresentation, each and every request for payment under such contract constitutes a false claim. *See United States v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 491 F.3d 254, 259 (5th Cir. 2007) (noting that, where contract is awarded as a result of false representations, subsequent claims for payment under the contract are "actionable false claims" since "they derived from the original fraudulent misrepresentation"), *citing Marcus v. Hess*, 317 U.S.537, 543-544 (1943); *United States v. Univ. of Phoenix*, 461 F.3d 1166, 1170-1171 (9th Cir. 2006) ("'[E]ach and every claim submitted under a contract ... which was originally obtained by means of false statements or other corrupt or fraudulent conduct ... constitutes a false claim'"), *quoting* S. Rep. No. 99-345, at 9 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5274; *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) ("the term 'false or fraudulent claim' includes those instances 'when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct'"); *see also United States ex rel. Longhi v. United States*, 575 F.3d at 473 (5th Cir. 2009) (holding that entire contract amount was proper measure of damages on fraudulently induced contract).

365. This case is similar to another case pending in this District, which the Court allowed to proceed after denying a motion to dismiss (and later partial summary judgment on damages). *U.S. ex. Rel. Savage, Savage Logistics, LLC v.*

*Washington Closure Hanford LLC, et al.* (E.D.W.A.) (Oct. 6, 2015) (Order Ruling on Pending Dismissal Motions And Other Motions, And Amending The Case Caption), Judge Salvador Mendoza.

366.    The court said in an Order denying a motion to dismiss: The old proverb, "It's not what you know but who you know," is at the heart of the assertions brought by the United States' and the Relators Salina Savage and her business Savage Logistics. The Plaintiffs allege that Defendants took their personal connections a step too far in order to gain a financial benefit, i.e., Defendants reached agreement amongst themselves to establish a façade of small, disadvantaged businesses that applied for, and were awarded small business government contracts by the prime contractor while the work under the contracts was actually performed by a large business rather than the small business.

## IV.    **DAMAGES AND PENALTIES**

### A.    **The Wrongdoing Alleged Harmed The Programs Designed to Help Qualified Small Businesses, Including Qualified SDVOSBs**

367.    As set forth above, the Federal Government has continuously supported giving preferred status to SDVOSBs in Government contracting, and has implemented, through executive orders, strategies to achieve the goal of honoring the extraordinary service that United States veterans have provided this nation. Executive Order No. 13360 (Oct. 21, 2004).

### 1. Damages

368. Defendants are jointly and severally liable for civil penalties consistent with the False Claims Act and other provisions, plus three times the amount of the damages which the Government sustained as a result of the violations. 31 U.S.C. § 3729(a)(1).

369. The legislative history of the FCA evidences Congress's intent to leave the courts "free to fashion measures of damages on a case by case basis." S. Rep No. 615, 96th Cong., 2d Sess, at 4.

370. There are numerous ways to measure damages in cases such as this where the government contracts for and receives a tangible asset (nuclear pharmaceutical services), but fails to achieve the contracted for programmatic goal—the economic benefit to businesses that qualify as service-disabled and veteran-owned.

371. As set forth in this Complaint, Congress set out to empower veterans through entrepreneurship. That noble goal has been knowingly undermined by defendants.

372. One appropriate measure of damages is the full amount paid to defendants under the contract. When a contractor violates a pre-condition of payment that relates directly to a contractor's eligibility to supply a particular good or service, nothing is due to the contractor, regardless of whether goods or services

were provided, and the resulting measure of damages to the United States is the full value of any amount paid out by the government.

373.   This theory of damages is supported by the "presumed-loss rule."   In September 2010, Congress enacted the "presumed-loss rule," which provides that damages are presumed to be the full amount expended on a contract obtained as a result of willful misrepresentation of small business size status. Congress created the rule precisely for cases like this one.

374.   The Small Business Jobs Act of 2010 (H.R. 5297) (SBJA) was enacted on September 27, 2010.   It created a program fund designed to increase the availability of credit for small businesses.   Under the law, Congress created the "presumed-loss rule" (15 U.S.C. § 632(w)(1), which provides that:

> In every contract [or] subcontract ... which is set aside, reserved, or otherwise classified as intended for award to small business concerns, there shall be a presumption of loss to the United States based on the total amount expended on the contract [or] subcontract ...whenever it is established that a business concern other than a small business concern willfully sought and received the award by misrepresentation.

375.   Under another alternative theory of damages, damages are arguably at least 50 percent of the total value of the contract because SBA regulations mandated that Caring Hands and Logmet perform at least 50 percent of the value of the work.   13 C.F.R. § 125.6(a)(1) – (a)(2).

376. A decision on summary judgment in the *Washington Closure Hanford* case may be instructive on calculating damages. The Court made the following findings (below). *U.S. ex. Rel. Savage, Savage Logistics, LLC v. Washington Closure Hanford LLC, et al.* (E.D.W.A.) (Aug. 24, 2017) (Order denying Motion for Partial Summary Judgement on Damages), Judge Salvador Mendoza.

> Defendant WCH moves for partial summary judgment on one issue only— the permissible scope of the Government's damages for WCH's alleged violations. WCH argues principally that the Government's damages must be limited to the remedies provided by the RCC contract. WCH alternatively argues that, if the contract remedies are not exclusive, the Small Business Act's presumption of loss does not apply and the value the Government received by WCH's and the subcontractors' performance must offset any damages.
>
> Each of WCH's arguments fail. First, the RCC Contract remedies are not exclusive in this case. The RCC Contract provides remedies for failure to meet SBS goals and to make a good faith effort to comply with the SBS plan, but those remedies do not address, and do not adequately compensate the Government for, alleged willful misrepresentation of the small-business or women-owned-business status of certain subcontractors. Second, the Small Business Act's presumption of loss applies to the Government's claims against WCH. Finally, because the harm caused by falsely claiming that a subcontractor is a qualifying small business is the lost value of business and experience going to a qualifying small business, the value of the work performed under the contract is irrelevant and cannot offset the damages for that alleged harm. There is no simple formula for calculating "actual damages" in this context. In apparent recognition of this difficulty, Congress established a presumption of loss that sets the baseline for the

Government's damages in cases like this one, citing 15 U.S.C. § 632(w)(1).

**B.  The Whistleblower Is a Proper Relator and Entitled to A Share**

      **1.    No Public Disclosure/Original Source**

377.  Relator has standing to bring this action pursuant to 31 U.S.C. §3730(b)(l).  Prior to becoming aware of any known public disclosure under subsection (e)(4)(a) of 31 U.S.C. § 3730, Relator voluntarily disclosed to the Government the information on which the allegations or transactions in this claim are based; and Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions that may exist, and has voluntarily provided the information to the Government before filing an action.

      **2.    Relator Share**

378.  Relator is either entitled to between 15-25 percent of the proceeds that result from this action or any settlement of the claims raised or identified herein, under 31 U.S.C. § 3730(d)(1); or between 25 – 35 percent of the proceeds pursuant to 31 U.S.C. §3730(d)(2).

## V.   COUNTS OF COMPLAINT

### COUNT I

**Federal False Claims Act:**

**31 U.S.C. § 3729(a)(1)(A)**

379.   The allegations in the preceding paragraphs are incorporated by reference.

380.   Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

381.   By virtue of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

382.   As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

### COUNT II

**Federal False Claims Act:**

**31 U.S.C. § 3729(a)(1)(B)**

383.   The allegations in the preceding paragraphs are incorporated by reference.

[SEALED] COMPLAINT PURSUANT TO 31 U.S.C §
3730 AND DEMAND FOR JURY TRIAL - 90

384. Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

385. By virtue of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

386. As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

## COUNT III

### Federal False Claims Act:

### 31 U.S.C. § 3729(a)(1)(C)

387. The allegations in the preceding paragraphs are incorporated by reference.

388. Defendants knowingly conspired to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G), in violation of 31 U.S.C. § 3729(a)(1)(C).

389. By virtue of these false or fraudulent claims, Defendants are jointly and severally

liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

390.   As a result of Defendants' violations, the United States has suffered damages in an

amount to be determined at trial.

## COUNT IV

### Federal False Claims Act:

### 31 U.S.C. § 3729(a)(1)(G)

391.   The allegations in the preceding paragraphs are incorporated by reference.

392.   Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

393.   By virtue of these false or fraudulent claims, Defendants are jointly and severally

liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

394.   As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

## COUNT V

**Federal False Claims Based on Anti-Kickback Statute
31 U.S.C. § 3729(a)(1)(A); 42 U.S.C. § 1320a-7b(b)**

395. The allegations in the preceding paragraphs are incorporated by reference.

396. Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729 (a)(1)(A).

397. The claims were false or fraudulent because they were tainted by kickbacks that Defendants knowingly and willfully provided to referring health care entities and providers and further to physicians who contracted with Defendants to induce referrals for behavioral health services for federal health care program beneficiaries, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

398. By virtue of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

399. As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

## COUNT VI

### Federal False Claims Based on Anti-Kickback Statute
### 31 U.S.C. § 3729(a)(1)(B); 42 U.S.C. § 1320a-7b(b)

400.  The allegations in the preceding paragraphs are incorporated by reference.

401.  Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

402.  The false records or statements included those appearing on Medicare and Medicaid Provider Agreements and claims submission forms —where Defendants falsely certified to the United States, *inter alia*, that their claims for Medicare and Medicaid payment were true, accurate, and complete—and where Defendants falsely certified to the United States, *inter alia*, their compliance with all "Medicare laws, regulations and program instructions . . . including, but not limited to, the Federal anti-kickback statute."

403.  The false records or statements were material to Defendants' claims for Medicare payment because Medicare would not have paid the claims absent the records or statements.

404.  By virtue of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

1    405.    As a result of Defendants' violations, the United States has suffered

2    damages in an amount to be determined at trial.

3

4    406.    Based on the foregoing, the Government has suffered damages, to be

5    determined at trial, as a result.

6
     WHEREFORE, Relator requests that judgment be entered in Plaintiff's
7
8    favor against Defendants as follows:

9        (a) Pursuant to Counts One through Five, for treble the amount of

10

11   damages incurred by the Government, in an amount to be determined at trial, and

12   penalty of $11,000 for each false claim submitted or caused to be submitted, each

13   record or statement made, used, presented or caused to be made, by Defendants;

14

15       (b) Awarding Relator its relator's share pursuant to 31 U.S.C. §

16   3730(d)(1) or (2);

17       (c) Awarding Relator costs and attorneys' fees pursuant to 31 U.S.C. §

18

19   3730; and

20       (d) Awarding such other relief as is appropriate under the law.

21   ////

22   ////

23
     ////
24
25   ////

26   ////

27

28

1

## VI.   JURY DEMAND

2

3

Plaintiffs hereby request a jury trial in this matter.

4

DATED this 14th day of November, 2017.

5

**BESTLAW PLLC**

6

7

*By:* _____

8

RYAN M. BEST, WSBA No. 33672
BESTLAW PLLC

9

905 W. Riverside Avenue, Suite 409
Spokane, Washington 99201

10

Attorney for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[SEALED] COMPLAINT PURSUANT TO 31 U.S.C §
3730 AND DEMAND FOR JURY TRIAL - 96