1  KATHLEEN H. PAUKERT, WSBA NO. 20247
PAUKERT & TROPPMANN, PLLC
2  522 W. Riverside Avenue, Suite 560
Spokane, Washington 99201
3  Telephone: (509) 232-7760
Facsimile: (509) 232-7762
4  Email: kpaukert@pt-law.com

5  TEJINDER SINGH, (admitted via pro hac vice)
GOLDSTEIN & RUSSELL, P.C.
6  7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814
7  Telephone: (202) 679-7007
Email: tsingh@goldsteinrussell.com

8
*Attorneys for Plaintiff-Relator UPPI, LLC*

9

10  **UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

11

| UNITED STATES OF AMERICA ex rel. UPPI, LLC, | Case No: 2:17-CV-378-RMP |
|---|---|
| Plaintiff-Relator, | **PLAINTIFF-RELATOR'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
| v. | |
| CARDINAL HEALTH, INC., et al., | Hearing Date: March 9, 2021 Without Oral Argument |
| Defendants. | |

12

13

14

15

16

17

18

19

20

21

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................ii

OPPOSITION TO MOTIONS TO DISMISS...................................1

ARGUMENT ...................................................................................3

   I.    Legal Standards ..................................................................3

     A.  The False Claims Act.......................................................3

     B.  Federal Rules of Civil Procedure 8 and 12(b)(6)..............5

     C.  Federal Rule of Civil Procedure 9(b) ...............................6

  II.   The Complaint Pleads Falsity ............................................8

  III.  The Complaint Satisfies Rule 9(b) ...................................23

  IV.  The Complaint States an Implied Certification Claim ....30

  V.   The Complaint Pleads Conspiracy ...................................31

  VI.  The Complaint Pleads That Cardinal Caused the SDVOSBs' False Claims.......................................................................32

  VII.  The Complaint Pleads Scienter ......................................35

  VIII. The Complaint Pleads Materiality...................................44

  IX.  The *Forum Non Conveniens* Argument Is Meritless ......54

  X.   The Rule 19 Joinder Argument Is Meritless ...................58

CONCLUSION ...............................................................................60

PLAINTIFF-RELATOR'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS - i

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1

# TABLE OF AUTHORITIES

2

## Cases

3

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
    824 F.3d 858 (9th Cir. 2016) ............................................................5

4

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .........................................................................5

5

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .........................................................................5

6

7

*Corley v. Rosewood Care Ctr., Inc.*,
    142 F.3d 1041 (7th Cir. 1998) ..........................................................7

8

*Driver v. Davis*,
    2017 WL 6391477 (E.D. Wash. Dec. 14, 2017) .............................55

9

*George v. City of Long Beach*,
    973 F.2d 706 (9th Cir. 1992) ..........................................................33

10

*Gonzalez v. Planned Parenthood of L.A.*,
    759 F.3d 1112 (9th Cir. 2014) ....................................................39, 40

11

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
    467 U.S. 51 (1984) ....................................................................35, 44

12

13

*Hooper v. Lockheed Martin Corp.*,
    688 F.3d 1037 (9th Cir. 2012) ........................................................35

14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .......................................................................33

15

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) .........................................................................46

16

*Moore v. Kayport Package Express, Inc.*,
    885 F.2d 531 (9th Cir. 1989) ............................................................7

17

18

*Paroline v. United States*,
    572 U.S. 434 (2014) .......................................................................33

19

*Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Rsrv. v.*
    *California*,
    813 F.3d 1155 (9th Cir. 2015) ........................................................17

20

*Rose v. Stephens Inst.*,
    2016 WL 5076214 (N.D. Cal. Sept. 20, 2016) ...............................52

21

PLAINTIFF-RELATOR'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS - ii

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

*Ruckh v. Salus Rehab., LLC*,
963 F.3d 1089 (11th Cir. 2020) ................................................................... 33

*Shaw v. AAA Eng'g & Drafting, Inc.*,
213 F.3d 519 (10th Cir. 2000) ..................................................................... 41

*Smith v. Carolina Med. Ctr.*,
274 F. Supp. 3d 300 (E.D. Pa. 2017) .......................................................... 52

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ....................................................................... 5

*Temple v. Synthes Corp.*,
498 U.S. 5 (1990) ........................................................................................ 58

*United States ex rel. Baker v. Cmty. Health Sys., Inc.*,
2014 WL 10212574 (D.N.M. May 16, 2014)................................................ 34

*United States ex rel. Campie v. Gilead Scis. Inc.*,
862 F.3d 890 (9th Cir. 2017) .............................................................*passim*

*United States ex rel. Chorches v. Am. Med. Response, Inc.*,
865 F.3d 71 (2d Cir. 2017) ............................................................................ 8

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
842 F.3d 103 (1st Cir. 2016)................................................................... 47, 52

*United States ex rel. Fields v. Bi-State Dev. Agency of the Missouri-Illinois
Metro. Dist.*,
2015 WL 5158398 (E.D. Mo. Sept. 2, 2015) ............................................... 34

*United States ex rel. Griffith v. Conn*,
117 F. Supp. 3d 961 (E.D. Ky. 2015) .......................................................... 44

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) .................................................................... 8, 29

*United States ex rel. Hagood v. Sonoma Cnty. Water Agency*,
929 F.2d 1416 (9th Cir. 1991) ........................................................ 35, 41, 44

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
352 F.3d 908 (4th Cir. 2003) ....................................................................... 45

*United States ex rel. Heath v. AT&T, Inc.*,
791 F.3d 112 (D.C. Cir. 2015).................................................................. 6, 25

*United States ex rel. Hendow v. Univ. of Phx.*,
461 F.3d 1166 (9th Cir. 2006) ....................................................................... 4

*United States ex rel. Lemon v. Nurses To Go, Inc.*,
924 F.3d 155 (5th Cir. 2019) ........................................................46

*United States ex rel. Longhi v. United States*,
575 F.3d 458 (5th Cir. 2009) ..........................................................4

*United States ex rel. Lusby v. Rolls-Royce Corp.*,
570 F.3d 849 (7th Cir. 2009) ............................. 8, 27, 28, 32

*United States ex rel. Marcus v. Hess*,
317 U.S. 537 (1943) ........................................................................4

*United States ex rel. Mayman v. Martin Marietta Corp.*,
894 F. Supp. 218 (D. Md. 1995) ....................................................44

*United States ex rel. Miller v. Weston Educ., Inc.*,
840 F.3d 494 (8th Cir. 2016) ........................................................45

*United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*,
2020 WL 7342662 (W.D. Tex. Dec. 14, 2020) ..............................52

*United States ex rel. Polukoff v. St. Mark's Hosp.*,
895 F.3d 730 (10th Cir. 2018) ........................................................7

*United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*,
892 F.3d 822 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1323 (2019) ................46

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*,
836 F.3d 770 (7th Cir. 2016) ..........................................................6

*United States ex rel. Rose v. Stephens Inst.*,
909 F.3d 1012 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1464 (2019) ..... 4, 46, 51

*United States ex rel. Savage v. Wash. Closure Hanford LLC*,
2017 WL 3667709 (E.D. Wash. Aug. 24, 2017) ............................47

*United States ex rel. Schmidt v. Zimmer, Inc.*,
386 F.3d 235 (3d Cir. 2004) ........................................................33

*United States ex rel. Thayer v. Planned Parenthood of the Heartland*,
765 F.3d 914 (8th Cir. 2014) ..........................................................7

*United States ex rel. Vatan v. QTC Med. Servs., Inc.*,
721 F. App'x 662 (9th Cir. 2018) ....................................................7

*United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*,
336 F.3d 375 (5th Cir. 2003) ........................................................26

*United States ex rel. Wuestenhoefer v. Jefferson*,
105 F. Supp. 3d 641 (N.D. Miss. 2015) ........................................33

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

*United States v. Berkeley HeartLab, Inc.*,
  2017 WL 4803911 (D.S.C. Oct. 23, 2017) ....................................... 52

*United States v. Bollinger Shipyards, Inc.*,
  775 F.3d 255 (5th Cir. 2014) ...................................... 41

*United States v. Dynamics Research Corp.*,
  2008 WL 886035 (D. Mass. Mar. 31, 2008) ...................................... 41

*United States v. Educ. Mgmt. Corp.*,
  871 F. Supp. 2d 433 (W.D. Pa. 2012) ........................................... 42

*United States v. Hodge*,
  933 F.3d 468 (5th Cir. 2019), *cert. denied*, 141 S. Ct. 131 (2020) .................. 33

*United States v. Inc. Vill. of Island Park*,
  888 F. Supp. 419 (E.D.N.Y. 1995) ...................................... 41

*United States v. Monaco Enterprises, Inc.*,
  2016 WL 3647872 (E.D. Wash. July 1, 2016) ................................. 26

*United States v. Quicken Loans Inc.*,
  239 F. Supp. 3d 1014 (E.D. Mich. 2017) ......................................... 33

*United States v. Rite Aid Corp.*,
  2019 WL 1426333 (E.D. Mich. Mar. 30, 2019) .................................... 52

*United States v. Strock*,
  982 F.3d 51 (2d Cir. 2020) ...................................... 8, 47

*United States v. Toyobo Co.*,
  811 F. Supp. 2d 37 (D.D.C. 2011) ...................................... 33

*United States v. United Healthcare Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) ............................................. *passim*

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  136 S. Ct. 1989 (2016) ............................................. *passim*

*Ward v. Apple Inc.*,
  791 F.3d 1041 (9th Cir. 2015) ...................................... 58

*Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
  953 F.3d 1108 (9th Cir. 2020), *petition for cert. pending*, No. 20-805
  (filed Dec. 3, 2020) ............................................... 35, 39

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

# Statutes

15 U.SC. § 644(a)............................................................................... 13, 15

15 U.SC. § 657f.................................................................................. 13, 21

15 U.SC. § 657s ..................................................................... 14, 15, 21, 49

15 U.SC. § 657s(a) ..................................................................... 14, 15, 21

28 U.SC. § 1404(a)...................................................................................54

31 U.SC. § 3729.......................................................................................1

31 U.SC. § 3729(a)(1)(A)......................................................................1, 3

31 U.SC. § 3729(a)(1)(B)......................................................................1, 3

31 U.SC. § 3729(a)(1)(C)......................................................................1, 3

31 U.SC. § 3729(b)(1)..............................................................................35

31 U.SC. § 3729(b)(4)..............................................................................44

31 U.SC. § 3730(b)(4)..............................................................................59

31 U.SC. § 3730(c)(3)..............................................................................59

38 U.SC. § 8127(k)(1)..............................................................................49

38 U.SC. § 8127(k)(2)..............................................................................49

38 U.SC. § 8127(k)(3)..............................................................................49

Protecting Business Opportunities for Veterans Act of 2019,
  Pub. L. No. 116-183, 134 Stat. 895 (2020) ......................................48

# Regulations

48 C.F.R. § 19.102(f) (2011) ............................................................18, 19

48 C.F.R. § 19.102(f)(1) (2011)..................................................................14

48 C.F.R. § 52.219-14 (2011) ............................................................19, 20

48 C.F.R. § 52.219-6(d) (2011) .................................................................15

48 C.F.R. § 817.7007 ...............................................................................22

48 C.F.R. § 817.7009 ...............................................................................22

48 C.F.R. § 852.219-10(e) ........................................................................22

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1

## Rules

2      Fed. R. Civ. P. 8 .................................................................................5

       Fed. R. Civ. P. 9(b)......................................................................*passim*
3
       Fed. R. Civ. P. 12(b)(6) ....................................................................5
4
       Fed. R. Civ. P. 19 ...........................................................................58
5
       Fed. R. Civ. P. 19(b)........................................................................60

6

## Other Authorities

7      166 Cong. Rec. H1180-01 (Feb. 25, 2020) .........................................49

8      Cardinal Health, Nuclear Medicine,
          https://www.cardinalhealth.com/en/product-solutions/pharmaceutical-
          products/nuclear-medicine.html..................................................38
9
       Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* (3d ed.),
10        Westlaw (database updated June 2020) .......................................59

11     U.S. Courts, U.S. District Courts–Combined Civil and Criminal, *Federal Court
          Management Statistics: Profiles* (Sept. 2020)...................................56
12
       Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
          (4th ed.), Westlaw (database updated Oct. 2020).......................54, 55

13

14

15

16

17

18

19

20

21

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

## OPPOSITION TO MOTIONS TO DISMISS

Relator UPPI, LLC respectfully opposes defendants' motions to dismiss, ECF No. 58, 59, 61, the Amended Complaint, ECF No. 37.[1]

The complaint alleges that health care behemoth Cardinal wanted lucrative contracts to supply radiopharmaceuticals to the VA, but didn't want to compete fairly. So Cardinal partnered with the SDVOSB Defendants, Caring Hands and Logmet, in a rent-a-vet scheme. Under the scheme, the SDVOSB Defendants exploited preferences reserved for SDVOSBs to win the contracts, knowing they had no ability to perform. Cardinal actually performed the contracts and ultimately got almost all the money—millions of dollars. Defendants' conduct made a mockery of the Government's contracting preferences, converting them into tools for a big business to beat legitimate small ones, and in the process charge the Government markups on important drugs. This rendered defendants' claims for payment under the contracts false or fraudulent, in violation of the False Claims Act (FCA), 31 U.S.C. § 3729(a)(1)(A), (B), and (C).

---

[1] The "complaint" is the Amended Complaint. Citations to the complaint are by paragraph number. Citations to other documents are by ECF and page number. For defendants' briefs, we use the page numbers at the bottom of the page. For their exhibits, we use the sequential page numbers at the bottom left. Undefined capitalized terms have the meanings assigned in the complaint.

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1    The motions to dismiss mainly argue that defendants were transparent in

2    their interactions with the Government, and that the VA's contracting officers

3    knew about defendants' unlawful arrangement and did not care. On this premise,

4    defendants dispute the elements of falsity, scienter, and materiality.

5    This is a bold argument. It requires the Court to accept—at the pleading

6    stage, no less—that defendants transparently informed contracting officers of

7    their intent to violate the law, and that the officers responded by knowingly

8    permitting the violations. The Court should reject that proposition because the

9    complaint disputes that defendants were honest, and that the Government knew

10    of the violations. *See, e.g.*, ¶¶ 50, 55, 92, 95, 97, 102, 140, 158. As explained in

11    greater detail below, when, as here, the parties "dispute exactly what the

12    government knew and when," a defense like this one raises "matters of proof, not

13    legal grounds to dismiss [UPPI's] complaint." *United States ex rel. Campie v.*

14    *Gilead Scis., Inc.*, 862 F.3d 890, 906-07 (9th Cir. 2017); *see infra* pp.41-42

15    (more cases). Moreover, even if contracting officers were knowingly or

16    recklessly aiding defendants, that is not a defense. It cannot be the case that any

17    time a contractor finds a contracting officer willing to ignore the rules, the

18    contractor is free to behave unlawfully. ¶¶ 55, 160; *see infra* p.44 (citing cases).

19    That would be a license for corruption—which the law does not give.

20    Defendants' other arguments for judgment on the pleadings are similarly

21    unpersuasive, and the motions should be denied.

1

## ARGUMENT

2      Cardinal filed the principal motion (ECF No. 59). It addresses falsity,

3  particularity, conspiracy, implied certification liability, its role in the process, its

4  scienter, and materiality. The other defendants incorporate Cardinal's motion by

5  reference. Caring Hands' motion (ECF No. 58-1) discusses particularity,

6  materiality, and the claims against Obie Bacon. Caring Hands also seeks

7  dismissal or transfer for *forum non conveniens* and urges joinder of the VA.

8  Logmet's motion (ECF No. 61-1) mostly incorporates the other defendants'

9  arguments, including Caring Hands' transfer request. This opposition responds to

10  each of these arguments.

11  ### I.     Legal Standards

12  #### A. The False Claims Act

13      The FCA is the United States' primary civil litigative tool to redress fraud on

14  the Government. In addition to protecting the public fisc, it safeguards the

15  integrity of Government programs, including Government contracting. As

16  relevant here, the FCA creates liability for any person who "knowingly presents,

17  or causes to be presented, a false or fraudulent claim for payment or approval,"

18  who "knowingly makes, uses, or causes to be made or used, a false record or

19  statement material to a false or fraudulent claim," or conspires to violate the

20  statute. 31 U.S.C. § 3729(a)(1)(A), (B), (C).

21

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

The FCA does not define "false or fraudulent." An archetypal false claim is when a contractor overcharges the Government, or charges for goods that were not provided as promised. But the statute reaches beyond that. Indeed, the Supreme Court has cautioned against "adopting a circumscribed view of what it means for a claim to be false or fraudulent." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) (quotation marks omitted).

Courts have thus recognized the theory of fraudulent inducement, sometimes called promissory fraud, under which claims for payment on a contract obtained by fraud are actionable, even if the claims are not literally false. *See, e.g.*, *Campie*, 862 F.3d at 902; *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1174 (9th Cir. 2006); *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542-45 (1943) (superseded by statute in part on other grounds); *United States ex rel. Longhi v. United States*, 575 F.3d 458, 468 (5th Cir. 2009).

The FCA also recognizes liability for false certifications, which occur when the defendant falsely certifies compliance (or omits noncompliance) with a material legal requirement—*e.g.*, a statute, regulation, or contractual provision—to obtain payment. *See Escobar*, 136 S. Ct. at 2002. If the defendant's noncompliance makes its representations about its performance materially misleading, liability attaches. *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1017-18 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1464 (2019).

PLAINTIFF-RELATOR'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS - 4

1

## B. Federal Rules of Civil Procedure 8 and 12(b)(6)

2    Federal Rule of Civil Procedure 8 requires a complaint to state a claim for

3    relief that is plausible on its face. "A claim has facial plausibility when the

4    plaintiff pleads factual content that allows the court to draw the reasonable

5    inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

6    *Iqbal*, 556 U.S. 662, 678 (2009). This is not "a probability requirement," and "a

7    well-pleaded complaint may proceed even if it strikes a savvy judge that actual

8    proof of the facts alleged is improbable, and that a recovery is very remote and

9    unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (quotation

10   marks omitted). Moreover, the plaintiff's explanation need not be the *only*

11   plausible one: "If there are two alternative explanations, one advanced by

12   defendant and the other advanced by plaintiff, both of which are plausible,

13   plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's

14   complaint may be dismissed only when defendant's plausible alternative

15   explanation is so convincing that plaintiff's explanation is *im*plausible." *Starr v.*

16   *Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). When adjudicating a motion to

17   dismiss under Rule 12(b)(6), the Court must "accept the complaint's well-

18   pleaded factual allegations as true, and construe all inferences in the plaintiff's

19   favor." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir.

20   2016).

21

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

### C. Federal Rule of Civil Procedure 9(b)

FCA complaints must satisfy Federal Rule of Civil Procedure 9(b), which provides that "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Broadly speaking, Rule 9(b) requires plaintiffs to allege the who, what, where, when, and how of a fraud. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016). The allegations must include enough detail "to give adequate notice to an adverse party and enable that party to prepare a responsive pleading." *Ibid.* (quotation marks omitted). "By requiring some factual basis for the claims, the rule protects against false or unsubstantiated charges." *Ibid.* But the standard "does not require absolute particularity or a recital of the evidence," and so "a complaint need not allege a precise time frame, describe in detail a single specific transaction or identify the precise method used to carry out the fraud." *Ibid.* (quotation marks omitted); *see also United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (rejecting an "overly rigid view" of Rule 9(b)'s requirements) (quotation marks omitted); *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015) ("Rule 9(b) does not inflexibly dictate adherence to a preordained checklist of 'must have' allegations."); *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 918 (8th

Cir. 2014) ("Rule 9(b) is context specific and flexible[.]") (quotation marks omitted).

Courts have also recognized that Rule 9(b)'s requirements should be "relaxed as to matters within the opposing party's knowledge." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989); *see also United States ex rel. Vatan v. QTC Med. Servs., Inc.*, 721 F. App'x 662, 663 (9th Cir. 2018) (holding that when "the relevant information is within the defendant's exclusive possession and control," the plaintiff may plead on information and belief); *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018) ("Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.") (quotation marks omitted); *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998) ("[T]he particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim, and that is most likely to be the case where, as here, the plaintiff alleges a fraud against one or more third parties.").

That rule may be especially important in FCA cases because plaintiffs are unlikely to have access to all of the defendant's interactions with the Government. Accordingly, courts apply Rule 9(b) in a purposive manner to ensure that it does not undermine Congress's objectives in enacting the FCA.

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

*See, e.g.*, *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 86 (2d Cir. 2017) (explaining that overly rigid application of Rule 9(b) "would discourage the filing of meritorious *qui tam* suits that can expose fraud against the government" and allowing a complaint to go forward when doing so did "no violence to [Rule 9(b)'s] purposes"); *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009) (similar); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (similar). As long as the defendant has adequate notice of the claim and can prepare a defense, that is enough. *See United Healthcare*, 848 F.3d at 1183 n.11 (rejecting an attempt to "cabin False Claims Act liability through artificial limits," and explaining that "what matters here is whether the complaint adequately pleads the circumstances of fraud to satisfy the dual purposes of Rule 9(b), not whether the complaint employs a particular means of doing so"); *United States v. Strock*, 982 F.3d 51, 66 n.7 (2d Cir. 2020) (denying Rule 9(b) dismissal in SDVOSB contracting fraud case when "none of the purported deficiencies cited by [defendant] was sufficient to deprive him of the requisite 'fair notice' of the government's claim").

## II.    The Complaint Pleads Falsity

The complaint alleges that the SDVOSB Defendants deceived the Government in three ways: (1) concealing their incapacity to perform the contracts, *e.g.*, their inadequate facilities, staff, and training; (2) concealing their

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

intended role, *i.e.*, that they planned to do effectively nothing to perform their contracts; and (3) misrepresenting their intention to abide by limitations on subcontracting—all for the purpose of obtaining radiopharmaceutical supply contracts, and receiving payment under those contracts. Those allegations plead falsity for fraudulent inducement and implied false certification.

Cardinal focuses on the third set of misrepresentations, regarding subcontracting limitations. Its first argument is that the limitations that expressly prohibited the SDVOSB Defendants from outsourcing their contracts to Cardinal were incorporated only into three of the eight contracts at issue in this case. ECF No. 59 at 18-19. That argument is wrong, *see infra* pp.12-23—but even if it were correct, it would not compel dismissal because noncompliance with subcontracting limitations was not defendants' only sin. The complaint pleads two other examples of falsity, each of which independently supports liability.

First, the complaint alleges that the SDVOSB Defendants concealed that they were unable to perform the requirements in the VA's solicitations because they lacked the necessary licensure, personnel, and training. ¶¶ 50, 81, 92. They represented that they could perform, and that they had facilities including warehouses and other delivery infrastructure. ¶¶ 95, 98-99. They also represented that they could comply with all the other technical requirements of the contract. ¶¶ 69-78. They could not, and they knew this at the time. ¶¶ 80-91. Lying about capacity to meet a contract's requirements in order to secure the contract is

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

textbook fraudulent inducement—whether the contracts were set aside or not, and whether subcontracting limitations applied or not.

Second, the complaint alleges that the SDVOSB Defendants "never disclosed the extremely limited role they intended to play" (*i.e.*, just issuing invoices for Cardinal's work). ¶ 95; *see also* ¶¶ 6, 52, 57, 101, 147. Instead, they stated and implied that they would be doing more, including acting as distributors and supplying warehouse facilities. *See* ¶¶ 50, 95, 98-99, 103. Thus, the problem in this case is not merely that the SDVOSB Defendants concealed noncompliance with a regulation or contractual requirement; they concealed a fact that, if known, would have manifestly prevented them from winning the contract—even if the contract had not been set aside. ¶ 117.

This is because, as the complaint explains, even when a contract is not set aside for SDVOSBs, the Government, and especially the VA, uses contracting preferences that give SDVOSBs a tremendous advantage. ¶¶ 3, 32. But those preferences seek to help businesses that actually intend to do the work under the contracts and are capable of doing so; they are not mere vehicles for pass-through arrangements for large companies like Cardinal. ¶ 4, 53. Had the Government known the role the SDVOSB Defendants were going to play, it would not have contracted with them. ¶ 117, 135-40, 160.

This also refutes Cardinal's argument that the Government knew about Cardinal's role. To be sure, the complaint acknowledges that in some cases, the

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

SDVOSB Defendants may have "mentioned Cardinal." ¶ 95. But it also quite clearly alleges that:

> [E]ven in these cases, the SDVOSB Defendants were not honest to the Government because they never disclosed the extremely limited role they intended to play. Instead, they stated that they would be acting as authorized distributors, or something similar, implying that they would be taking possession of and delivering radiopharmaceutical products to the Government. The SDVOSBs' bids thus obscured the true nature of their role, which was to send invoices and collect a markup, while Cardinal performed all of the core obligations under the contract.

*Ibid*. Indeed, the complaint consistently and repeatedly alleges that the Government did not know the truth. *See* ¶ 50 ("The SDVOSB Defendants" made false representations "during the market research phase, the solicitation phase, and the performance phase."); ¶ 55 ("Defendants exploited Government contracting officers who were either unaware of who was actually performing the contract, unaware of the contractual requirements, unaware of the surrounding legal rules, or knowingly or recklessly assisting Defendants in violation of those requirements and rules."); ¶ 92 ("[T]he SDVOSB Defendants misled the Government into awarding the contracts to them"); ¶ 97 ("When the Government conducted pre-solicitation market research and asked SDVOSBs whether they could perform the contracts to determine the appropriateness of an SDVOSB set aside, the SDVOSB Defendants told the Government that they could when they knew they could not," and the Government took "the contractors at their word" and "relied upon their representations."); ¶ 102

("When the SDVOSB Defendants were asked whether they would perform or were performing at least 50% of the work under the contracts, they falsely answered affirmatively."); ¶ 140 ("Instead of being honest, however, Defendants misrepresented and concealed that the 'front companies' did little if any of the work"); ¶ 158 ("[T]he Government's contracting officers were deceived by Defendants"). At bottom, the degree to which the Government actually knew of Cardinal's role vis-à-vis any given contract is a factual question that can only be determined after discovery. It is not a basis for holding that defendants were honest as a matter of law when the complaint alleges otherwise.

Because these two sets of misrepresentations have nothing to do with the fact that the contracts were set aside, or the fact that subcontracting limitations applied, the Court should hold that the complaint pleads falsity even if the Court accepts Cardinal's argument that subcontracting limitations only applied to a subset of the contracts.

The Court should also reject Cardinal's argument because the complaint does not concede or allege that the subcontracting limitations only applied to three contracts, and the materials subject to judicial notice do not prove that proposition if the Court draws inferences in UPPI's favor, as it is required to do.

First, everybody agrees that subcontracting limitations did apply to Caring Hands' contracts for three venues (Durham, Birmingham, and San Antonio). This concession alone establishes falsity for these contracts, and for subsequent

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1    contracts for Caring Hands. As the complaint alleges, when Caring Hands

2    executed these contracts, it knew that it had no intention of abiding by these

3    restrictions, and made a false promise to do so. ¶¶ 58, 61, 92. That is fraudulent

4    inducement. The complaint also alleges that Caring Hands' fraud in obtaining the

5    Durham contract "pav[ed] the way for future set-asides for Caring Hands

6    because future market research would show that Caring Hands had previously

7    been awarded a radiopharmaceutical supply contract." ¶ 98. Thus, the fraudulent

8    inducement did not stop with the Durham contract, but tainted Caring Hands'

9    other contracts as well.

10       Cardinal is also wrong to argue that the limitations did not apply elsewhere.

11   The parties agree that the most relevant subcontracting limitation is the

12   "nonmanufacturer rule," which provides that, in performing a set aside contract,

13   a small business that is not a manufacturer may only supply products

14   manufactured by other small businesses, unless it first obtains a waiver from the

15   SBA. *See* ECF No. 59 at 9; *see also* ¶ 37 (explaining the nonmanufacturer rule).

16       By statute and regulation, this limitation applied to all small business and

17   SDVOSB set aside contracts. The "limitations on subcontracting" provision of

18   the Small Business Act, 15 U.S.C. § 631 *et seq*., provides that in any contract for

19   supplies awarded pursuant to the small business set aside program (15 U.S.C.

20   § 644(a)) or the SDVOSB set aside program (15 U.S.C. § 657f), subcontracting

21   limitations—including the nonmanufacturer rule—apply. *See* 15 U.S.C.

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1  § 657s(a). In the implementing regulations, the nonmanufacturer rule provided

2  that "[a]ny concern submitting a bid or offer in its own name . . . that proposes to

3  furnish an end product it did not manufacture," must either "furnish[] in the

4  performance of the contract, the product of a small business manufacturer or

5  producer," or obtain a waiver from the SBA. 48 C.F.R. § 19.102(f)(1) (2011).

6  Under the statute and the regulations, the nonmanufacturer rule applies to all

7  set aside contracts—and defendants knew this. ¶¶ 55, 60-61, 64, 66.

8  Accordingly, when the VA performed market research to see whether any

9  SDVOSBs were capable of supplying radiopharmaceuticals, or when the VA

10  solicited bids on the contracts, the SDVOSB Defendants knew that in order to

11  respond affirmatively, they had to be able to perform the contracts consistently

12  with the limitations on subcontracting. ¶¶ 57, 79-80, 97-99. They also knew that

13  they were incapable of doing so. ¶¶ 80-91. Thus, any response in the research or

14  solicitation process suggesting capacity to perform—which is an essential

15  prerequisite to setting a contract aside and then receiving the award—was

16  necessarily false. ¶ 114.

17  In addition to the three contracts mentioned above, the Miami contract, the

18  Columbia contract, and the Albuquerque contract were all set aside. By statute

19  and regulation, the nonmanufacturer rule necessarily applied to these contracts.

20  Defendants' arguments to the contrary lack merit.

21

PLAINTIFF-RELATOR'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS - 14

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1    The Miami contract was issued as a set aside contract in October 2014, and

2   another version was issued in November 2014. There are two apparent

3   differences between the versions. First, the October contract was explicitly

4   marked on its cover page as "set aside" for small businesses. ECF No. 60-4 at 62.

5   In the November contract, the box "unrestricted" was checked instead. ECF No.

6   60-5 at 95. Second, the October contract was for a one-year term, and a total

7   contract amount of over $721,868. ECF No. 60-4 at 66. The November contract

8   was for a two-month term, with an amount of $174,983.86. ECF No. 60-5 at 99-

9   100. However, both versions incorporated the clause "Notice of Total Small

10   Business Set-Aside (NOV 2011)," the clause "Limitations on Subcontracting,"

11   and a clause to ensure "monitoring and compliance" of limitations on

12   subcontracting. ECF No. 60-4 at 77, 83; ECF No. 60-5 at 111, 118. The Notice

13   of Total Small Business Set-Aside provided that "[a] small business concern

14   submitting an offer in its own name shall furnish, in performing the contract,

15   only end items manufactured or produced by small business concerns." 48

16   C.F.R. § 52.219-6(d) (2011). This regulation implements the same statutory

17   nonmanufacturer rule as in SDVOSB set asides. *See* 15 U.S.C. § 657s(a)

18   (providing that the limitations on subcontracting apply to set aside contracts

19   under 15 U.S.C. § 644(a)).

20    Defendants argue that limitations on subcontracting, including the

21   nonmanufacturer rule, apply only to set aside contracts, which the Miami

PLAINTIFF-RELATOR'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS - 15

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

contract ceased to be in November, as evidenced by the checking of the box "unrestricted" on the front page. ECF No. 59 at 10 & n.4; ECF No. 58-1 at 17. This argument is unpersuasive for two reasons.

First, it misses the point of the fraudulent inducement claim, which deals with how the contract was procured in the first place. It is plain that the Miami contract was originally issued as a set aside in October, with the attendant limitations on subcontracting, to which Caring Hands falsely agreed. As the complaint explains, contracts are issued as set asides when the Government's research supports a claim that a small business can perform the contract—a conclusion that was necessarily based on the representations Caring Hands made during the research and bidding process. ¶¶ 32-33, 97, 105, 116. Caring Hands' false promise to abide by limitations on subcontracting is there in black and white in the October contract. Nothing that happened later can retroactively change that.

Second, defendants' argument requires the Court to draw an impermissible pro-defense inference at the pleading stage. Defendants want the Court to infer that because the box "unrestricted" was checked in the November contract, Caring Hands' representations that it would comply with limitations on subcontracting were irrelevant to the award of that contract. But the record does not disclose the relationship between the October and November contracts, nor why the contract was re-issued to Caring Hands, nor why the "unrestricted" box

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1    was checked—and it certainly does not disclose that the Government intended to

2    free Caring Hands from compliance with the nonmanufacturer rule. All the

3    record shows is that Caring Hands agreed to two contracts—one in October and

4    one in November—*and both* expressly incorporated the nonmanufacturer rule.

5        In light of that, there are two, independent ways to reject defendants'

6    argument vis-à-vis the November contract. First, given the tight temporal nexus

7    between the October and November contracts, it is plausible that the fraud used

8    to win the October contract (*e.g.*, responses in market research and bidding) also

9    allowed Caring Hands to get the November contract, and therefore tainted the

10   claims under that contract as well. Second, the Court should hold that the

11   November contract maintains the restrictions on subcontracting. As noted, the

12   November contract includes the total small business set aside clause (which

13   incorporates the nonmanufacturer rule), as well as limitations on subcontracting,

14   and provisions to monitor those limitations.

15       Defendants argue that even though those limitations were included in the

16   contract, they did no work once the "unrestricted" box was checked on the cover

17   page because the clauses only apply to set aside contracts. But that makes little

18   sense: Why would the contract expressly include multiple provisions that could

19   never apply? *See, e.g.*, *Pauma Band of Luiseno Mission Indians of the Pauma &*

20   *Yuima Rsrv. v. California*, 813 F.3d 1155, 1171 (9th Cir. 2015) ("An

21   interpretation which gives effect to all provisions of the contract is preferred to

PLAINTIFF-RELATOR'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS - 17

1    one which renders part of the writing superfluous, useless or inexplicable.")

2    (quoting 11 *Williston on Contracts* § 32:5 (4th ed. 2015)). At a minimum, the

3    contrary interpretation is plausible. Thus, rather than assume at the pleading

4    stage that the contract includes multiple superfluous provisions, the Court should

5    hold that the complaint pleads falsity with respect to this contract, and allow the

6    facts to be developed.

7        The contract for Columbia likewise was set aside for SDVOSBs. On the first

8    page, the SDVOSB box is checked. ECF No. 60-3 at 33. The contract also

9    includes a "Notice of Service-Disabled Veteran-Owned Small Business Set-

10   Aside," *id.* at 53 (capitalization altered), as well as a "VA Notice of Total

11   Service-Disabled Veteran-Owned Small Business Set-Aside," *id*. at 54. These

12   notices provide that "[a]ny service-disabled veteran-owned small business

13   concern (nonmanufacturer) must meet the requirements in 19.102(f) of the

14   Federal Acquisition Regulation to receive a benefit under this program." *Id*. at 54

15   (subsection (f)), 55 (subsection (e), which is the same, except that "non-

16   manufacturer" is hyphenated). The targeted rule, 48 C.F.R. § 19.102(f), is the

17   nonmanufacturer rule. Caring Hands thus promised compliance with this

18   condition, and that promise was false because Caring Hands did not intend to

19   supply the products of a small business, nor obtain a waiver from the SBA.

20       Notwithstanding the contractual language, defendants argue that the

21   nonmanufacturer rule did not apply because the *other* limitation on

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

subcontracting, 48 C.F.R. § 52.219-14 (which requires a small business that *is* a manufacturer to perform "at least 50 percent of the cost of manufacturing"), was not incorporated into the contract. ECF No. 59 at 10; ECF No. 58-1 at 17. As proof, defendants submit the contract, which does not have a box checked to incorporate this specific limitation. ECF No. 60-3 at 48. They also submit a "bridge contract" executed in 2019, which does not incorporate this limitation on subcontracting, because the contract officer concluded that the original contract did not incorporate it either. Specifically, the addendum to the bridge contract states that:

> Bridge contract number 36C247-19-P-1190 will follow all terms and conditions listed in the previous contract number VA247-14-C-0365. Limitations on subcontracting pursuant to FAR 52.219-14 were not applicable during the award of contract VA247-14-C-0365 and therefore will not apply to the follow-on bridge contract.

ECF No. 60-14 at 259. Based on this language, defendants argue that the 2014 contract did not include *any* limitations on subcontracting. Defendants' are wrong.

As defendants themselves point out, 48 C.F.R. § 52.219-14 is not the only relevant limitation—or even the most relevant one. *See* ECF No. 59 at 9 (arguing that "[b]ecause the SDVOSBs were *not* manufacturers of the radiopharmaceuticals, the 50% cost of manufacturing limitation did not apply"). Instead, the more relevant limitation on subcontracting is the nonmanufacturer rule, which appears in 48 C.F.R. § 19.102(f). As explained above, the

nonmanufacturer rule was expressly incorporated in the original Columbia contract, and nothing in the 2019 bridge contract says otherwise. Indeed, the bridge contract expressly states that it will "follow all terms and conditions" of the previous contract, ECF No. 60-14 at 259; it *only* says that limitations pursuant to 48 C.F.R. § 52.219-14 were not part of the original contract, *ibid.*; and it continues to expressly incorporate the nonmanufacturer rule, *see id.* at 280 (clause (e)). To the extent the contracting officer of the 2019 bridge contract interpreted the 2014 contract not to include that limitation, he was plainly mistaken—and clearly so, because the 2014 contract was a set aside, and was therefore required by statute and regulation to incorporate the nonmanufacturer rule (which, in fact, it did). The Court should accordingly deny the motion to dismiss vis-à-vis the 2014 Columbia contract.

The 2019 bridge contract itself presents a closer case. To be fair to defendants, it appears possible that the VA was attempting to allow Caring Hands to source products from Cardinal for the bridge period (from September 2019 until February 2020). But two problems are apparent. First, the modifications to the contract did not authorize that approach. Specifically, the contract continues to incorporate the nonmanufacturer rule, which prohibits this arrangement. The contract is therefore internally contradictory and ambiguous on this point, and judgment on the pleadings would be inappropriate. Second, to the extent the bridge contract attempts to suspend the nonmanufacturer rule without

1   a waiver from the SBA, the contract is unlawful. Like the original contract, the

2   bridge contract was set aside for SDVOSBs. The contract cites 15 U.S.C. § 657f

3   as the authority for the set aside. *See* ECF No. 60-14 at 273. Under 15 U.S.C.

4   § 657s(a), the nonmanufacturer rule applies to all such contracts. There is no

5   lawful way for a contracting officer to ignore or suspend those limitations, and

6   the Court should not read the bridge contract to do so.

7       At the absolute minimum, the Court should not infer from the bridge

8   contract that Caring Hands' conduct was permissible or immaterial in other

9   cases. The bridge contract was issued to avoid a disruption in "critical care to our

10  Veterans." ECF No. 60-14 at 280. The Government's willingness to ignore

11  subcontracting limitations and forgo competitive bidding in that exigent

12  circumstance does not speak to other situations. Instead, it shows that once the

13  SDVOSB Defendants successfully defrauded the Government, it became

14  difficult to oust them—a fact that supports materiality and causation.

15      Logmet's Albuquerque contract was also expressly set aside for SDVOSBs.

16  ECF No. 60-9 at 228. Defendants correctly argue that the check-boxes for

17  limitations on subcontracting were not checked. But as just explained, every

18  SDVOSB set aside contract *must* include those limitations—and Logmet could

19  not meet them, which means that Logmet misrepresented its ability to perform

20  when it sought the contract. The complaint alleges that during the research

21  process for this contract, "Logmet falsely represented that it was capable of

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

performing the contract, including because it had warehouses and other infrastructure in place that would allow it to deliver the specified products rapidly in Albuquerque," which it did not have. ¶ 99. "These misrepresentations resulted in the contract being set aside and then awarded to Logmet." *Ibid*. Moreover, the complaint alleges that the VA acted as if the limitations on subcontracting applied. During a back-and-forth about Logmet's role in the contract, "[t]he contracting officer informed Logmet that it had been awarded the contract on the belief that Logmet would be performing 50% of the work. Logmet's contract was terminated shortly after its limited role was revealed." ¶ 103. Thus, in the case of the Albuquerque contract, the fact that the nonmanufacturer rule was not expressly incorporated into the contract is not fatal to the fraudulent inducement claim. The law required its application anyway.[2]

_____

[2] The omission may have been a clerical error. The contract was awarded pursuant to 48 C.F.R. § 817.7007, which authorizes sole source awards to SDVOSBs. A regulation provides in mandatory language that "[t]he contracting officer shall insert VAAR clause 852.219-10, Notice of Total Service–Disabled Veteran–Owned Small Business Set–Aside . . . in solicitations and contracts for acquisitions under this subpart." 48 C.F.R. § 817.7009. That notice incorporates the nonmanufacturer rule. *See* 48 C.F.R. § 852.219-10(e). By law, this requirement should have been in the contract.

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

Moreover, the complaint alleges that Logmet lied to induce the VA to set the contract aside, and lied about its role during the performance period. The fraudulent inducement and implied false certification claims therefore stand.

Finally, defendants' argument about Logmet's Denver waiver is unpersuasive. As the complaint acknowledges, the SBA issued a waiver of the nonmanufacturer rule for that contract. However, the language of the waiver is revealing. The waiver describes Logmet as "a small business distributor of radiopharmaceuticals." ECF No. 60-15 at 291. But Logmet did not act as a "distributor" in any recognizable sense of that word. ¶ 65. It did not, for example, take possession of radiopharmaceuticals and deliver them to the VA. Based on the language used in the waiver, it is highly likely, and at least plausible, that Logmet lied to the VA about what its role would be, representing that it would act as a "distributor" instead of merely as a pass-through for money to Cardinal. ¶¶ 65, 129 n.9. Put differently, had Logmet disclosed its actual intended role, a waiver would not have been granted. Accordingly, the waiver and the contract are tainted by fraud, and still actionable under the FCA.

## III.    The Complaint Satisfies Rule 9(b)

Cardinal and Caring Hands both argue that the complaint lacks the particularity required by Rule 9(b). But the complaint includes more than enough information to give defendants notice of the claims against them. It identifies specific contracts by location, contract number, and date range, ¶¶ 58, 62, as well

PLAINTIFF-RELATOR'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS - 23

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

as amounts paid under those contracts, ¶¶ 59, 62. It explains that the allegations relate to the market research, ¶¶ 97-99; solicitation, ¶ 69, 80-81; contracting, ¶ 100; and performance phases, ¶¶ 102-04. The complaint also sets forth the key contractual requirements, ¶¶ 69-79; details the characteristics of the SDVOSB Defendants that made it impossible for them truthfully to certify their compliance with these requirements, ¶¶ 82-91; and provides examples of falsehoods by the SDVOSB Defendants, ¶¶ 92, 98-99, 103. The complaint also spells out Cardinal's role, explaining that it provided essential support in the preparation of bids (including encouragement, technical advice, and pricing information), ¶¶ 6, 51, 93-95, 105-06; as well as performing the contracts and keeping the lion's share of the revenue, ¶¶ 101, 107, 148-49, 156; and encouraging SDVOSBs to bid to trigger the Rule of Two, ¶¶ 108-12.

Rule 9(b) does not require more than that. As the Ninth Circuit has explained, "statements of the time, place and nature of the alleged fraudulent activities are sufficient"; it is not necessary to provide "absolute particularity or a recital of the evidence," to "describe in detail a single specific transaction," or to "identify the precise method used to carry out the fraud." *United Healthcare*, 848 F.3d at 1180 (quotation marks omitted). In *United Healthcare* itself, the complaint alleged that the defendants set up a scheme whereby they used software to review diagnoses in a way that would catch and correct underreporting (and thereby increase their reimbursements) but not catch

1    overreporting (which would reduce their reimbursements). The complaint

2    identified an approximate timeframe ("[b]etween and during about 2005 and

3    about 2007"), it identified the defendants, it identified the software they used,

4    and it alleged that they used the software to effectuate the scheme by creating

5    lists of patients to be reviewed using unlawful criteria. *Id.* at 1181. That was

6    enough—and the complaint here easily includes that level of detail.

7         The D.C. Circuit's decision in *Heath* is similarly instructive. There, the

8    relator accused AT&T of overcharging the Government for services. *See Heath*,

9    791 F.3d at 123. The court held that the complaint identified "who" (AT&T) did

10   what (overcharged the Government by violating a contractual requirement to

11   provide the lowest price available), where (nationwide through its subsidiaries),

12   and when (from 1997 to 2009). *See id.* at 124. It explained that the complaint had

13   "put AT&T on fair notice of the fraud of which it is accused." *Ibid.* The court

14   rejected three responses: (1) that the complaint did not identify specific

15   affirmative misrepresentations (because fraud does not always require explicit

16   falsehoods); (2) that the complaint did not identify individuals who made false

17   statements (because identification of AT&T was specific enough); and (3) that

18   the complaint lacked representative examples of false claims (because they were

19   not necessary to put AT&T on notice of the fraud or to ensure that the complaint

20   was not meritless). *See id.* at 124-25.

21

1    Against these points, defendants argue that the complaint lacks information

2    about the "content and timing" of the statements made to the VA because it does

3    not include specifics about individual bid proposals. ECF No. 59 at 20. The cases

4    above show that this is not necessary, and the cases Cardinal cites (ECF No. 59

5    at 21) are easily distinguished. *United States ex rel. Willard v. Humana Health*

6    *Plan of Texas Inc.*, 336 F.3d 375 (5th Cir. 2003), involved a "one-sentence

7    allegation, devoid of any factual information that arguably did not even meet the

8    pleading requirements of Federal Rule of Civil Procedure 8(a), and certainly did

9    not meet the requirements of Rule 9(b)." *Id.* at 385 (brackets and quotation

10    marks omitted). The complaint here includes much more than that. And *United*

11    *States v. Monaco Enterprises, Inc.*, 2016 WL 3647872, at *7 (E.D. Wash. July 1,

12    2016), was a case in which the relator conceded that the complaint did not satisfy

13    Rule 9(b), and was granted leave to amend. Here, by contrast, the complaint

14    includes detailed allegations as to each element that enable defendants to prepare

15    their response.

16    For example, the complaint identifies each technical and legal requirement in

17    the bid proposals, and explains why the SDVOSB Defendants could not have

18    honestly asserted that they met those requirements. *See* ¶¶ 69-91. Yet somehow,

19    the SDVOSB Defendants succeeded in having the contracts set aside (which

20    required the VA contracting officers to conclude, after research, that SDVOSBs

21    were capable of performing, ¶¶ 29-33, 97-99, 116), and then winning the

PLAINTIFF-RELATOR'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS - 26

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

contracts (which required the contracting officers to conclude that defendants could meet the requirements, ¶¶ 48, 54, 69, 92, 139-40). From those facts, it is a plausible inference that the SDVOSB Defendants misled the contracting officers about their ability to meet the requirements—which is what the complaint alleges. ¶¶ 92, 97, 113, 144. The alternative—which defendants would have the Court believe—is that the SDVOSB Defendants honestly disclosed that they could not perform the contracts, but several different contracting officers across the nation all awarded the contracts to the SDVOSB Defendants anyway. That is, frankly, incredible—and the complaint says so, alleging that "no contracting officer who knew the facts and the law could reasonably and in good faith have awarded the contracts to the SDVOSB Defendants." ¶ 160. Of course, if that is what happened, the SDVOSB Defendants can introduce those facts in discovery. But the contrary allegations in the complaint certainly include enough detail for the SDVOSB Defendants to prepare that defense.

The Seventh Circuit's decision in *Lusby* is helpful on this point. There, the defendant argued that the plaintiff failed to show that the defendant had submitted a single, specific false certification of compliance with contractual requirements. The Seventh Circuit held that such an allegation was not necessary "at the outset of the suit." *Lusby*, 570 F.3d at 854. The court explained that while it was "essential to show a false statement," "much knowledge is inferential," and the inference the relator offered, *i.e.*, that a false certification had likely been

submitted, was "a plausible one" in light of the regulatory regime, which required certifications to accompany requests for payment. *Ibid*. It was not necessary for the pleading to "exclude all possibility of honesty in order to give the particulars of fraud." *Ibid*. So, too, here. The complaint explains how the market research and solicitation process works, and therefore explains why the SDVOSB Defendants must have misrepresented their capacity during that process. That allegation is plausible, and gives defendants notice of the claim against them.

To require more would be to require proof at the pleading stage, which Rule 9(b) does not do. Here, the facts defendants fault the complaint for omitting, *e.g.*, defendants' communications with the Government during the solicitation process, and the invoices defendants submitted, are exclusively within defendants' possession. Rule 9(b) is relaxed in this circumstance, *see supra* p.7 (citing cases), and the complaint's allegations on information and belief, which are plausibly grounded in facts UPPI does know, are more than enough to survive the pleading stage. After all, defendants cannot reasonably argue that they do not know what they said to the VA about: (1) their ability to meet the contracts' technical requirements; (2) the role they intended to play in performance of the contracts; and (3) their ability and intent to adhere to subcontracting limitations, during the research, solicitation, and performance phases of the enumerated contracts.

PLAINTIFF-RELATOR'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS - 28

This also dispenses with Caring Hands' argument that the complaint does not plead the actual submission of false claims. ECF No. 58-1 at 9-11. The complaint pleads amounts paid under the contracts, ¶¶ 59, 62. Those amounts could only have been the result of claims for payment—and so, unlike the cases Caring Hands cites, this is not a case in which the plaintiff is merely speculating that claims could have been submitted (which happens when, for example, a health care provider engages in misconduct that affects Government-funded health care plans and private payors alike, and it is not clear whether any false claims were actually submitted to the Government). Here, the only party that could have been billed under the fraudulently obtained contracts was the VA, and so it is a certainty that claims were submitted under these contracts. The exact details are already in defendants' possession, and are not essential to the allegations here, which do not turn on the details of particular claims, but instead on the ways the contracts were obtained and kept, which are described with particularity. *See, e.g.*, *Grubbs*, 565 F.3d at 190 ("Stating 'with particularity the circumstances constituting fraud' does not necessarily and always mean stating the contents of a bill. The particular circumstances constituting the fraudulent presentment are often harbored in the scheme.").

At the very absolute minimum, the complaint satisfies Rule 9(b) with respect to the misrepresentations that appear in the contracts themselves, *i.e.*, false promises to comply with the technical terms, and with the nonmanufacturer rule.

Defendants themselves have the contracts and have put them in the record as materials subject to judicial notice. The contractual terms they agreed to are spelled out in black and white in exhibits to defendants' own motions, and the complaint explains how those representations were false when made. Defendants have everything they need to defend against those allegations.

This also addresses Caring Hands' contention that the complaint fails to state a claim against Obie Bacon. ECF No. 58-1 at 19-20. Bacon was the signatory on the Caring Hands contracts, and thus personally made the false representations therein. It is also, of course, a fair inference that he made similar representations earlier in the contracting process.

### IV.    The Complaint States an Implied Certification Claim

Cardinal argues that the complaint does not plead that defendants made any specific representations about goods provided, which were rendered false by their noncompliance. ECF No. 59 at 23-24. Here, the invoices (which are in defendants' possession, ¶ 104) would have identified the specific radiopharmaceuticals that the SDVOSB Defendants claimed were provided, which would have implied that the radiopharmaceuticals were provided as promised, *i.e.*, by qualified small business entities that met all the contractual requirements.

The situation is analogous to *Escobar*. There, the Supreme Court held that when the defendant used billing codes corresponding to particular services, it

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

implicitly represented that the staff providing those services were properly qualified and trained. *See* 136 S. Ct. at 2000. As the Court explained, "[a]nyone informed that a social worker at a Massachusetts mental health clinic provided a teenage patient with individual counseling services would probably—but wrongly—conclude that the clinic had complied with core Massachusetts Medicaid requirements." *Ibid*. Because the clinic had not complied with those requirements, the bills constituted misrepresentations.

Here, anyone reviewing an invoice for radiopharmaceuticals from Caring Hands or Logmet would probably, but wrongly, conclude that those entities had compounded and delivered the pharmaceuticals they were charging for—which was false. At a minimum, the Government would probably, and again wrongly, believe that those entities were doing *something* productive to earn the money they were charging.

## V.    The Complaint Pleads Conspiracy

Cardinal argues that the conspiracy claim fails because the complaint does not plead an unlawful agreement to defraud the Government, but instead only pleads that Cardinal agreed to supply radiopharmaceuticals to the SDVOSB Defendants. ECF No. 59 at 24. Logmet similarly argues that its interactions with Cardinal might have just been independent behavior, and not coordinated. ECF No. 61-1 at 8.

Not so. The complaint specifically alleges that this is a rent-a-vet fraud scheme, under which the SDVOSB Defendants and Cardinal agreed that the SDVOSB Defendants would act as fronts for Cardinal, using their preferred status to win contracts for Cardinal's benefit, thus allowing Cardinal to avoid fair competition. ¶¶ 6-7, 51-52, 93-94, 105-07, 113. Moreover, the complaint alleges that defendants knew at all times that the SDVOSB Defendants were not eligible for these contracts, but they collaborated to ensure that the SDVOSB Defendants could win and keep them anyway. ¶¶ 107, 144-50. Nothing more is required at the pleading stage. A conspiracy need not be in writing. *See Lusby*, 570 F.3d at 854. And conspiracy is often inferred from circumstantial evidence. Here, it is at least plausible that Cardinal had unlawful agreements with the SDVOSB Defendants.

## VI.    The Complaint Pleads That Cardinal Caused the SDVOSBs' False Claims

The complaint pleads that Cardinal's conduct was a but-for and proximate cause of the SDVOSBs Defendants' false claims. It was a but-for cause because the SDVOSB Defendants could not have prepared their bids without coaching and assistance from Cardinal, ¶¶ 49, 51, 105-06, and could not have supplied radiopharmaceuticals without Cardinal, ¶ 107. Indeed, Cardinal appears to acknowledge that the complaint pleads but-for causation. ECF No. 59 at 28-29.

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1    Cardinal's conduct was also a proximate cause of the SDVOSB Defendants'

2 false claims. "Proximate-cause analysis is controlled by the nature of the

3 statutory cause of action. The question it presents is whether the harm alleged

4 has a sufficiently close connection to the conduct the statute prohibits." *Lexmark*

5 *Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). The test

6 is "'flexible,'" and "often explicated in terms of foreseeability or the scope of the

7 risk created by the predicate conduct." *Paroline v. United States*, 572 U.S. 434,

8 444-45 (2014) (citation omitted). "Questions of proximate causation are issues of

9 fact which are properly left to the jury if reasonable persons could reach different

10 conclusions." *George v. City of Long Beach*, 973 F.2d 706, 709 (9th Cir. 1992).

11    Consistent with these principles, courts hold that under the FCA, it is enough

12 to show that the defendant's conduct was "at least a substantial factor in causing,

13 if not the but-for cause of, submission of false claims." *United States v. Toyobo*

14 *Co.*, 811 F. Supp. 2d 37, 48 (D.D.C. 2011) (quotation marks omitted); *Ruckh v.*

15 *Salus Rehab., LLC*, 963 F.3d 1089, 1107 (11th Cir. 2020); *United States ex rel.*

16 *Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244 (3d Cir. 2004); *United States ex rel.*

17 *Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 681 (N.D. Miss. 2015). Courts

18 also recognize that "foreseeability is the appropriate benchmark for allegations of

19 proximate cause" in FCA cases. *United States v. Quicken Loans Inc.*, 239 F.

20 Supp. 3d 1014, 1041 (E.D. Mich. 2017); *United States v. Hodge*, 933 F.3d 468,

21 475 (5th Cir. 2019), *cert. denied*, 141 S. Ct. 131 (2020); *United States ex rel.*

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

*Fields v. Bi-State Dev. Agency of the Mo.-Ill. Metro. Dist.*, 2015 WL 5158398, at *5 (E.D. Mo. Sept. 2, 2015); *United States ex rel. Baker v. Cmty. Health Sys., Inc.*, 2014 WL 10212574, at *18 (D.N.M. May 16, 2014).

Here, the complaint plausibly alleges that Cardinal's actions were at least a substantial factor in causing the SDVOSB Defendants to use false statements and submit false claims, and that outcome was than foreseeable. The complaint alleges that Cardinal encouraged the SDVOSB Defendants to bid on radiopharmaceutical contracts, ¶ 6, and that the entire point of the scheme was for Cardinal to gain a shortcut to contracts that it would otherwise have had to obtain through fair competition (or would have lost to bona fide small businesses), ¶¶ 6, 52-54, 156-57. The complaint also alleges that this conduct was part of Cardinal's ongoing effort to monopolize the market for radiopharmaceuticals. ¶¶ 150-55. The complaint thus alleges that Cardinal knowingly employed the SDVOSB Defendants as front companies—an allegation that is eminently plausible because Cardinal received the largest benefit from the arrangement. ¶¶ 52, 148. And it alleges that causing the Government to contract with the SDVOSB Defendants was not merely foreseeable, but was in fact "*the intended outcome* of Defendants' fraud." ¶ 142 (emphasis added). That is enough to plead proximate causation.

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

## VII.   The Complaint Pleads Scienter

Cardinal (but not the other defendants) disputes that it acted with scienter. The FCA's definition of "knowingly" is relatively broad. It includes actual knowledge, deliberate ignorance, and recklessness—and requires "no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1). Thus, "what constitutes the offense is not intent to deceive but knowing presentation of a claim that is either 'fraudulent' or simply 'false.'" *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991); *see also Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1049 (9th Cir. 2012) (reversing district court that required plaintiff to demonstrate that defendant "acted with 'the intent to deceive'" as "the wrong legal standard for determining FCA liability"). As the Ninth Circuit and the Supreme Court have explained, this looser scienter standard applies because "[p]rotection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law." *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1122 (9th Cir. 2020) (quoting *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 63 (1984)) (brackets omitted), *petition for cert. pending*, No. 20-805 (filed Dec. 3, 2020). Moreover, under Rule 9(b), "scienter need not be pleaded with particularity, but may be alleged generally," meaning that "[a] complaint needs only to allege facts supporting a plausible inference of scienter." *Ibid.*

Here, the complaint alleges Cardinal's scienter. ¶¶ 148-57. The question is whether the Court is required, at the pleading stage, to disregard these allegations as implausible. It is not.

First, the entire scheme is corrupt on its face, making an inference of scienter easy. As the complaint explains, this was a scam, through and through. Cardinal was trying to avoid facing fair competition, and the SDVOSB Defendants—who had no business being anywhere near these contracts—found a way to take money from the Government for doing nothing. ¶¶ 50, 54. The Government paid more for drugs than it should have. ¶¶ 6, 52. Genuine small businesses that might otherwise have had a shot at these contracts lost out. ¶¶ 53-54. The arrangement also violated clear statutes and regulations governing contracts for nuclear pharmaceuticals, as well as the laws governing set aside contracts.

One easy way to understand why Cardinal had scienter is to imagine how an honest business in Cardinal's position, which was interested in providing radiopharmaceuticals to these VA locations, would have reacted when the VA sought to set aside contracts for entities like Caring Hands and Logmet that had absolutely no ability to perform them. An honest business would have protested and demanded that the contracts be opened up to competition so that it could win them fairly. *See* ¶ 157; ¶¶ 118-30 (describing protests by others). Cardinal, of course, did no such thing—because it was already pulling strings behind the scenes to ensure that its front companies would win the contracts on its behalf.

1    Indeed, the complaint alleges that Cardinal's conduct here was a continuation of

2    its other efforts to unlawfully monopolize the market for radiopharmaceuticals.

3    ¶¶ 150-55. And it alleges that Cardinal received the vast majority of the revenue

4    from these contracts, *i.e.*, millions of dollars. ¶¶ 6, 52, 59, 62.

5         Cardinal argues that the complaint does not allege facts showing that

6    Cardinal knew about the existence of subcontracting limitations in the SDVOSB

7    Defendants' contracts, nor that Cardinal knew how such provisions affected

8    Cardinal. ECF No. 59 at 32. But the complaint alleges that Cardinal and the

9    SDVOSB Defendants planned this entire scheme together before they even bid

10   on the contracts. ¶ 93. Indeed, the entire point of the scheme was to induce the

11   Government to set the contracts aside, so that the SDVOSB Defendants could

12   win them on Cardinal's behalf. ¶ 156. Of course Cardinal had to know that the

13   rules governing set asides applied.

14        Moreover, Cardinal would have learned that the contracts were set aside

15   because the SDVOSB Defendants confirmed with Cardinal that it could supply

16   the specific products to the specific location identified in the solicitation. ¶ 51.

17   That interaction would have revealed the terms of the solicitations to Cardinal. It

18   would also have revealed that the SDVOSBs were incapable of performing the

19   contracts themselves. ¶ 148. Once Cardinal knew all that, it would have known

20   that limitations on subcontracting, including the nonmanufacturer rule, applied—

21   because such limitations apply to all set aside contracts. ¶ 146. And of course,

PLAINTIFF-RELATOR'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS - 37

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

Cardinal would have known that it is not a small business that can supply products under the nonmanufacturer rule, because Cardinal is gigantic. ¶¶ 13, 68, 149.

Cardinal argues that its sophistication provides no basis to infer that it knew the law. ECF No. 59 at 28. But Cardinal is not merely a little bit sophisticated; it is *the* leading provider in this space. Thus, Cardinal's website boasts that it has "[t]he largest national network and the industry's most comprehensive portfolio of radiopharmaceuticals." Cardinal Health, Nuclear Medicine, https://www.cardinalhealth.com/en/product-solutions/pharmaceutical-products/nuclear-medicine.html (last visited Feb. 10, 2021). It claims that it can "manufacture, dispense and deliver radiopharmaceuticals with expert efficiency to the highest regulatory standards." *Ibid*. And it has a "dedicated team of reimbursement experts" to "help you understand the impact of reimbursement rules on procedures." *Ibid*. (click to expand "Experts in the field of nuclear medicine"). Moreover, Cardinal has won billions of dollars in Government contracts. If an SDVOSB with no experience in supplying radiopharmaceuticals approached Cardinal about supplying products for the Government, it is utterly incredible that Cardinal would not have determined whether the contract had been set aside. The cases Cardinal cites do not hold otherwise; none apply to an entity as large and entrenched as Cardinal, nor to regulatory requirements as clear as the ones at issue here.

Even if the Court entertains the fiction that Cardinal may not have had actual knowledge of the existence of the limitations on subcontracting, it still displayed either reckless disregard for the truth, or deliberate ignorance of the truth. ¶¶ 55, 144, 148-49. The facts were there for anybody in Cardinal's position to see—all it had to do was ask the SDVOSB Defendants or the VA—and Cardinal should not be able to escape liability by engaging in "ostrich" type behavior, *i.e.*, burying its head in the sand and failing "to make simple inquiries which would alert [it] that false claims [were] being submitted." *United Healthcare*, 848 F.3d at 1174 (quotation marks omitted). Indeed, as the party receiving most of the benefit from these contracts, Cardinal was required to "act with scrupulous regard for the requirements of law." *Winter*, 953 F.3d at 1122 (quotation marks omitted). This, it clearly did not do.

The cases Cardinal cites are not to the contrary. In *Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112 (9th Cir. 2014), the plaintiff's allegation was that Planned Parenthood had overcharged for contraceptives. Planned Parenthood was charging the State its "usual and customary" rates for the contraceptives, instead of selling them at cost. *Id*. at 1113. No statute or regulation required Planned Parenthood to sell contraceptives at cost, but there was a provision in a manual somewhere. *Ibid*. The plaintiff alleged that Planned Parenthood had knowingly overcharged the State, but he attached to his complaint numerous letters between the defendant and the State. In the letters,

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

Planned Parenthood disclosed to the State that it was charging its usual and customary rates, and the State did not object. *See id.* at 1114. The State later conducted an audit, and informed Planned Parenthood that it should have charged less, but also acknowledged that the rules were unclear, and did not seek to recoup funds from Planned Parenthood. *See ibid.* In light of that exculpatory back-and-forth, the Ninth Circuit held that it was implausible that Planned Parenthood knew it had been doing anything wrong. *Id.* at 1115-16.

This case is different for two reasons. First, the rule in *Gonzalez* was ambiguous enough that the defendant could have had a reasonable belief that it was compliant, and therefore a good scienter argument. There is no similar ambiguity here. The statutes, regulations, and contractual requirements are clear, and so the SDVOSB Defendants were simply not eligible to bid on these contracts, or perform them the way they did. That is why the complaint expressly alleges that "Defendants' actions were not based on a good-faith misunderstanding or reasonable misinterpretation of the legal requirements," but were instead "pure opportunism." ¶ 156. Second, the complaint here does not include any exculpatory exchange in which defendants came clean to the Government about the fact that the SDVOSB Defendants were acting as mere pass-throughs for Cardinal—and so there is no obvious explanation for why Cardinal could have thought its behavior was lawful. Instead, as noted above, the complaint alleges repeatedly that defendants misled the Government about the

1  true scope of Cardinal's role, and about their ability and intent to perform the

2  contracts. *See supra* pp.11-12 (citing ¶¶ 50, 55, 92, 95, 97, 102, 140, 158); *see*

3  *also* ¶¶ 98-99, 103 (providing additional specific examples).

4          These allegations defeat Cardinal's defense at the pleading stage. *See Shaw*

5  *v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000) (holding that

6  absent a showing of complete transparency by the defendant, government

7  knowledge is not a defense to liability as a matter of law); *United States v.*

8  *Dynamics Research Corp.*, 2008 WL 886035, at *17 (D. Mass. Mar. 31, 2008)

9  (holding that this defense is available, if at all, only when the defendant "fully

10 disclosed all of the facts underlying the fraudulent schemes to the government");

11 *United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 442 (E.D.N.Y. 1995)

12 (holding that this defense applies, if at all, only when "the defendant had made

13 full disclosure" before contracting with the Government); If Cardinal wants to

14 make an argument based on the Government's knowledge of its behavior, the

15 time to do that is after the record is fully developed with respect to such

16 knowledge. *See, e.g., Hagood*, 929 F.2d at 1421 (rejecting government

17 knowledge defense at the pleading stage and explaining that "[o]nly at the stage

18 of trial or summary judgment will it be possible for a court to say" that the

19 defendant was acting honestly); *United States v. Bollinger Shipyards, Inc.*, 775

20 F.3d 255, 264 (5th Cir. 2014) ("All circuit court authorities suggest that the

21 defense should not be applied at this stage because it serves simply as a factor

1    weighing against the defendant's knowledge, as opposed to a complete negation

2    of the knowledge element."); *United States v. Educ. Mgmt. Corp.*, 871 F. Supp.

3    2d 433, 455 (W.D. Pa. 2012) (holding that Government knowledge and

4    acquiescence are "affirmative defenses on which [defendant] bears the burden of

5    proof").

6         In response, Cardinal rehashes its contention that the SDVOSB Defendants

7    disclosed Cardinal's role to the VA by sometimes mentioning Cardinal in their

8    bids, or by having the VA pharmacists order products directly from Cardinal.

9    ECF No. 59 at 34-35. But the allegations Cardinal cites refer, at most, to a subset

10   of the contracts; they cannot justify dismissing the entire case. Moreover, the

11   complaint is clear that "even in these cases, the SDVOSB Defendants were not

12   honest to the Government" during contracting because they never disclosed the

13   true nature of the arrangement to the contracting officers. ¶ 95. In fact, "they

14   stated that they would be acting as authorized distributors, or something similar,"

15   falsely "implying that they would be taking possession of and delivering

16   radiopharmaceutical products" themselves. *Ibid*. The complaint also explains that

17   even if "certain Government officials . . . may have known that Cardinal was

18   playing a role in the performance of the contracts," that would not be a basis to

19   dismiss because "[t]he extent of such knowledge is not known," and "any such

20   knowledge does not negate Defendants' scienter" in any event. ¶ 158.

21

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1    That is for several reasons. First, the events Cardinal points to (submitting

2    Cardinal's NRC license and allowing orders directly from Cardinal) happened

3    after market research was done—and so they cannot negate fraud at the research

4    phase, which resulted in the contracts being set aside in the first instance.

5    Second, merely having the SDVOSB Defendants submit Cardinal's license

6    would not necessarily tell the contracting officer anything about Cardinal's size,

7    relationship to the SDVOSB Defendants, or the anticipated scope of its role in a

8    particular contract. The most Cardinal can say here is that this disclosure *could*

9    *have* caused the Government to probe further to determine whether the SDVOSB

10    Defendants could perform the contracts consistent with all relevant conditions.

11    But that speculative possibility is not enough, at the pleading stage, to negate

12    scienter altogether. Third, the VA's pharmacists are not responsible for enforcing

13    contractual requirements—and may not even have been aware of them—and so

14    they could not have knowingly acquiesced in Cardinal's violations. ¶ 159.

15    Finally, the complaint belies Cardinal's suggestion that responsible

16    Government officials blessed defendants' conduct. It alleges that "no contracting

17    officer who knew the facts and the law could reasonably and in good faith have

18    awarded the contracts to the SDVOSB Defendants." ¶ 160. To the extent any

19    officer permitted defendants' conduct with full knowledge, the complaint alleges

20    that the officer "was acting in bad faith," and was "complicit in Defendants'

21    efforts to manipulate contracting preferences." *Ibid*. The acquiescence of such a

contracting officer could not give defendants a reasonable, good faith belief that they were behaving properly, because such officers were not actually speaking for the Government, and their acquiescence could not change the law in any event. *See, e.g.*, *Heckler*, 467 U.S. at 63 ("[T]hose who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law."); *Hagood*, 929 F.2d at 1421 ("That the relevant government officials know of the falsity is not in itself a defense."); *United States ex rel. Griffith v. Conn*, 117 F. Supp. 3d 961, 984 (E.D. Ky. 2015) ("Even if certain officials knew about the alleged fraud . . . that knowledge did not modify the relevant federal law and regulations."); *United States ex rel. Mayman v. Martin Marietta Corp.*, 894 F. Supp. 218, 223 (D. Md. 1995) ("Even assuming that [defendant] did inform the Government of its precise actions, a government officer cannot authorize a contractor to violate federal regulations.").

## VIII.  The Complaint Pleads Materiality

Cardinal and Caring Hands argue that the misrepresentations in this case were not material to the Government's decisions to enter into contracts. ECF No. 59 at 35-42; ECF No. 58-1 at 11-19.

Under the FCA, "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Materiality focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Ibid.* (quotation

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

marks omitted). Thus, a matter is material if a reasonable person "would attach importance to it," *or* "if the defendant knew or had reason to know" that the Government would attach importance to it, "even though a reasonable person would not." *Id*. at 2002-03 (quotation marks and brackets omitted).

Importantly, materiality does not require causation; instead, materiality is properly understood as potential for causation. The question is whether the defendant lied about something important—not whether that lie actually caused the Government to behave a particular way. *See, e.g.*, *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 916-17 (4th Cir. 2003) (explaining that materiality "focuses on the potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered"). Of course, causation shows materiality *a fortiori*.

In the context of a fraudulent inducement claim, the question is whether the defendant's misrepresentation was material to the Government's decision to award a contract. *See, e.g.*, *United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 504 (8th Cir. 2016). In this case, the relevant misrepresentation is that the SDVOSB Defendants represented that they were able to perform these contracts in compliance with all applicable conditions, when in fact they were incapable of performing, and intended instead only to issue marked up invoices for work that Cardinal was doing, pocketing the markup as compensation for allowing Cardinal to rent their SDVOSB status.

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1  In the context of an implied certification claim, materiality asks whether the

2  legal requirement that the defendant violated was material to the Government's

3  contracting or payment decisions. The relevant legal requirements here are the

4  statutes, regulations, and contractual provisions governing radiopharmaceutical

5  supply contracts, including but not limited to restriction on subcontracting.

6  Under either theory, materiality is a holistic inquiry. A variety of factors are

7  relevant, and no factor is typically dispositive against materiality. *See Escobar*,

8  136 S. Ct. at 2001 (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39

9  (2011)). Some considerations, which the Supreme Court identified in the implied

10  certification context, include whether the Government has designated the

11  requirement a condition of payment, whether the violation goes to the "essence

12  of the bargain," and whether the violation is "minor or insubstantial." *Id*. at 2003

13  & n.5 (quotation marks omitted). Another factor is how the Government has

14  reacted to the violation or to similar violations in the past. *Id*. at 2003.

15  Dismissals on the pleadings for lack of materiality are rare. After *Escobar*,

16  several circuits, including the Ninth, have held that materiality typically should

17  not be resolved at the pleading stage when various factors point in different

18  directions. *See Rose*, 909 F.3d at 1020; *Campie*, 862 F.3d at 904-07; *United*

19  *States ex rel. Lemon v. Nurses to Go, Inc.*, 924 F.3d 155, 162 (5th Cir. 2019);

20  *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d

21  822, 831-38 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1323 (2019); *United States*

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

*ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109-12 (1st Cir. 2016).

Violations in analogous cases have also been deemed material. The complaint cites *United States ex rel. Savage v. Washington Closure Hanford LLC*, 2017 WL 3667709, at *4 (E.D. Wash. Aug. 24, 2017), which found violations of small business subcontracting rules material. ¶ 134. In a recent SDVOSB contracting fraud case, the Second Circuit held that the Government pleaded materiality. *See Strock*, 982 F.3d at 65. The court found two factors—the express nature of the requirements and the substantiality of the noncompliance— weighed "firmly in favor of materiality," while "the government's response to noncompliance in this and other cases" also "support[ed] materiality," but "only weakly." *Ibid*. A similar analysis leads to the same result here.

With respect to fraudulent inducement, the complaint pleads materiality because a reasonable person would care whether a vendor bidding on a contract was capable of performing it, and would also care whether an SDVOSB was actually going to do meaningful work on the contract. ¶ 117. Indeed, it is hard to imagine why any contracting officer would knowingly offer a contract to an SDVOSB that had neither the ability nor intention to do any meaningful work, but was instead planning to act merely as a pass-through for a large business. A reasonable contracting officer also would not ignore restrictions on

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

subcontracting incorporated into set aside contracts; those restrictions are necessary to ensure that the program achieves its intended purpose.

The Government also actually cares about this issue. The complaint alleges that defendants' misrepresentations caused the Government to set aside the contracts, and to award them to the SDVOSB Defendants when it otherwise would not have. ¶ 135; *see also* ¶¶ 136-42 (providing additional allegations of causation). Conduct that actually affects the Government's behavior obviously has the potential to do so, and therefore satisfies the materiality standard.

Independently, the complaint identifies other indicia that this issue is important to the Government and its contracting decisions. Thus, the complaint cites a litany of enforcement actions against rent-a-vet arrangements that are effectively indistinguishable from this one. ¶ 132. It also describes four bid protests in which SDVOSBs that were not capable of performing were denied contracts—including the example of Logmet's contract in Albuquerque, which shows that this issue matters vis-à-vis these very defendants. ¶¶ 118-30. And it cites legislation expressly authorizing suits under the FCA when small businesses misrepresent themselves. ¶ 131.

That evidence has only grown stronger. After the complaint was filed, Congress legislated further in this area, enacting the Protecting Business Opportunities for Veterans Act of 2019, Pub. L. No. 116-183, 134 Stat. 895 (2020). The statute provides that the limitations on subcontracting in 15 U.S.C.

1  § 657s apply to all contracts awarded to SDVOSBs and veteran owned small

2  businesses under the VA's set aside program, and requires contractors to certify,

3  under penalty of perjury, that they will comply with the limitations. *See* 38

4  U.S.C. § 8127(k)(1), (2). It also enhances enforcement authority, procedures, and

5  penalties. *Id.* § 8127(k)(3). Legislators who spoke in favor of the statute

6  explained that it was designed to stop "improper passthroughs," which "occur

7  when a small business obtains a contract under set-aside award conditions, but

8  gives all, or substantially all, of the work to a large company while collecting

9  profit for doing absolutely nothing." 166 Cong. Rec. H1180-01, H1181 (Feb. 25,

10  2020) (Rep. Bergman). The legislators emphasized that "[t]his practice has long

11  been prohibited by law and wastes taxpayer dollars, but, unfortunately, in reality,

12  agencies up until this point have had little ability to stop it." *Ibid.*; *see also ibid.*

13  (Rep. Roe) (explaining that the statute was necessary because "there have long

14  been some fly-by-night small businesses that obtain set aside contracts only to

15  pass on all of the work to large businesses while collecting the profits. This is

16  illegal, but the law is difficult to enforce."). This new statute shows that the

17  Government takes the specific problem at issue in this case seriously, and

18  regards it as important to contracting decisions.

19     Other factors likewise support materiality. As the complaint explains, a

20  contract can only be set aside if research shows that SDVOSBs are capable of

21  performing it. *See* ¶¶ 32-33, 136. Thus, the SDVOSBs' representations were

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

material to the set aside decision, which was, in turn, key to the contracting

decision. ¶ 135. Moreover, the notices incorporated into most of the contracts

expressly stated that "[a]ny service-disabled veteran-owned small business

concern (nonmanufacturer) must meet the requirements in [the nonmanufacturer

rule] to receive a benefit under this [set aside] program." *E.g.*, ECF No. 60-3 at

54. This express conditioning supports the contention that the nonmanufacturer

rule was material to contracting decisions.

To put the issue in terms of *Escobar*, compliance with these rules is a

condition of being awarded VA set aside contracts, and goes to the essence of the

parties' bargain, making noncompliance a substantial issue. Indeed, these rules

are critical to the success of the set aside program. ¶ 134.

The complaint also shows how the misconduct in this case caused the

Government to pay more than it should have for radiopharmaceuticals. As the

complaint alleges, the markup paid to SDVOSBs was pure loss to the

Government, which could have contracted with Cardinal directly and avoided

that payment had the contract been issued under competitive conditions. ¶ 164.

Because the fraud actually caused the Government to pay money it should not

have paid, it was *per se* material to the Government's payment decisions.

Defendants argue that the VA had actual knowledge of their noncompliance,

but continued to pay, and that the VA regularly pays claims despite similar

noncompliance. ECF No. 59 at 37-40. In *Escobar*, the Court stated that:

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

> [I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

136 S. Ct. at 2003-04. Defendants argue that the Government had actual knowledge of Cardinal's role—including because of UPPI's complaint—but paid anyway. For several reasons, this does not entitle defendants to dismissal.

First, the complaint does not allege or concede that the Government had actual knowledge of the violations. On the contrary, it alleges that the Government did not know of violations. *See supra* pp.10-23 (citing ¶¶ 50, 55, 92, 95, 97, 102, 140, 158). The statements in the complaint that defendants cite, *i.e.*, that the SDVOSB Defendants sometimes mentioned Cardinal to the Government, do not negate these allegations. They show, at most, that in some cases, the Government might have had information from which it could have investigated and discovered a violation. But that is not the same as having actual knowledge. Controlling precedents hold that at the pleading stage, it is inappropriate to rely on continued payments as evidence of immateriality absent a concession of actual knowledge. *See Rose*, 909 F.3d at 1021 ("The record does not establish that, during the relevant time period, the Department had actual knowledge that Defendant was violating the incentive compensation ban. We cannot, therefore, analyze the Department's behavior here to determine whether

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

compliance with the incentive compensation ban was material."); *Campie*, 862 F.3d at 906-07 ("[N]o such concession is made here. Rather, the parties dispute exactly what the government knew and when, calling into question its 'actual knowledge.'"). Instead, the issue is a "matter[] of proof, not legal grounds to dismiss relators' complaint." *Campie*, 862 F.3d at 907.

Second, defendants are wrong to argue that the filing of UPPI's complaint conferred actual knowledge on the Government. As the First Circuit explained in the *Escobar* remand, "mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance." *Escobar*, 842 F.3d at 112. Other courts agree that continued payment despite knowledge of allegations does not defeat materiality under *Escobar*. *See, e.g.*, *United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 2020 WL 7342662, at *23 (W.D. Tex. Dec. 14, 2020); *United States v. Rite Aid Corp.*, 2019 WL 1426333, at *8 (E.D. Mich. Mar. 30, 2019); *Smith v. Carolina Med. Ctr.*, 274 F. Supp. 3d 300, 319 (E.D. Pa. 2017); *Rose v. Stephens Inst.*, 2016 WL 5076214, at *6 (N.D. Cal. Sept. 20, 2016). This argument is especially strong in a case like this one, because the Government is unlikely to stop paying for important drugs merely because it becomes aware of certain allegations. *See, e.g.*, *United States v. Berkeley HeartLab, Inc.*, 2017 WL 4803911, at *7 (D.S.C. Oct. 23, 2017) ("The Government does not enjoy the luxury of refusing to reimburse health care

1    claims the moment it suspects there may be wrongdoing."). Instead, the extent of

2    the Government's knowledge remains a matter of proof, to be determined later.

3        Third, the complaint explains that knowledge by individual Government

4    employees, whether pharmacists or contracting officers, should not be

5    interpreted to mean that the VA, or the Government as a whole, regards the

6    requirements in this case as immaterial. ¶¶ 158-60. Defendants have not

7    produced any official statement of policy, or similar, suggesting that the

8    Government does not care. The fact that a few employees may have been

9    exploited or complicit does not negate materiality because those employees do

10    not speak for the Government, or even the VA, as a whole.

11        Finally, even if the Government had actual knowledge of the violations, and

12    chose to pay anyway, that would not be dispositive at the pleading stage. As

13    explained above, the inquiry is holistic, and no one factor is dispositive. Other

14    factors—including price impact, the effect on the set aside decision, and the

15    common sense truth that the arrangement in this case was flatly contrary to the

16    letter and spirit of the rules—weigh in favor of materiality, making this a factual

17    question for resolution later. Moreover, as the recent legislation establishes,

18    limitations on subcontracting have been difficult to enforce—but that does not

19    make them unimportant in the Government's view. Accordingly, it would "be a

20    mistake" to "read too much into" continued payments. *Campie*, 862 F.3d at 906.

21

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1

### IX.    The *Forum Non Conveniens* Argument Is Meritless

2      Caring Hands and Logmet—but not Cardinal—assert a *forum non*

3  *conveniens* defense, asking this Court to either dismiss the case or, if it denies the

4  motion to dismiss, to transfer the case to another district (which one, they do not

5  specify). The Court should reject this argument for a few reasons.

6      First, *forum non conveniens* is the wrong doctrine for this situation, and

7  dismissal is the wrong remedy. As the leading treatise explains, "*forum non*

8  *conveniens* today applies only when the superior forum is in a foreign country or

9  perhaps, under rare circumstances, a state court or a territorial court." 14D

10  Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*

11  § 3828 (4th ed.), Westlaw (database updated Oct. 2020) (footnotes omitted)

12  (Wright & Miller). It does not apply when the defendant merely wishes to litigate

13  in a different district court. In this circumstance, dismissal is essentially never the

14  right answer.

15      Instead, the correct legal framework is whether a transfer is appropriate

16  under 28 U.S.C. § 1404(a), which permits a transfer "[f]or the convenience of

17  parties and witnesses, in the interest of justice," to another district in which a

18  case "might have been brought." Whether transfer is appropriate generally turns

19  on public and private interest factors—the public factors including the district

20  court's familiarity with the governing law, and the relative congestion of the

21  courts, and the private factors including convenience to the parties and witnesses,

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

and relative ease to access of sources of proof. *See* 15 Wright & Miller § 3847. The determination is highly discretionary.

There are a few glaring problems with the request for a transfer. First, defendants do not even have a view of where the case should be litigated. Cardinal has not joined the request for a transfer at all. Caring Hands says the case should go to the "appropriate forum," but does not say where that should be. ECF No. 58-1 at 22. It suggests that the case could go to South Carolina, Georgia, Ohio, or the location of any VA hospital identified in the complaint, but it does not actually analyze the suitability of any of those jurisdictions. *Ibid*. Logmet expressly "does not opine as to where this litigation should occur," but throws out Columbus, Ohio; Washington, D.C.; Savannah, North Carolina; Atlanta, Georgia; and Denver, Colorado as possibilities. ECF No. 61-1 at 9. The lack of consensus or even a coherent argument on the defense side for an alternative forum makes it almost impossible to evaluate the merits of a transfer request, and the request should be denied for that reason alone because "[t]he burden is on the defendants to demonstrate that the transfer is warranted." *Driver v. Davis*, 2017 WL 6391477, at *5 (E.D. Wash. Dec. 14, 2017).

Second, defendants' request for a transfer is conditional upon this Court first adjudicating and denying their motions to dismiss. Defendants are thus openly forum-shopping: If they lose their motion to dismiss, they would like a new judge who might be more favorably disposed to rule in their favor as a matter of

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

law—either on reconsideration or at summary judgment. That is not in the "interests of justice," and the Court should deny the request on that basis.

The public interest factors also do not favor a transfer. Plainly, once this Court adjudicates and denies a motion to dismiss, it will have superior familiarity with the governing law. With respect to court congestion, this Court is one of the least congested in the country. According to the Federal Judicial Center, this Court had 299 pending cases per judgeship in September 2020. *See* U.S. Courts, U.S. District Courts–Combined Civil and Criminal, *Federal Court Management Statistics: Profiles* 75 (Sept. 2020), *available at* https://www.uscourts.gov/sites /default/files/data_tables/fcms_na_distprofile0930.2020.pdf. Compare that with 1698 in the Southern District of Ohio, 796 in the Northern District of Georgia, 578 in South Carolina, 561 in Colorado, 388 in the Western District of North Carolina, and 373 in Washington, D.C., and it is clear that the alternative forums named in Caring Hands' and Logmet's briefs are more congested than this one. *See id.* at 2, 23-24, 43, 79, 93.

Defendants focus mostly on the private interest factors, but these do not weigh against venue here. Defendants ignore one important private interest factor, which is that the U.S. Attorney's Office here investigated this case, and should have the opportunity to participate as it sees fit—which would be harder if the case were transferred. There is no interest on the other side of the ledger weighty enough to displace that. As defendants acknowledge, this case involves

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

alleged misconduct that occurred all over the nation, and so whichever venue hears the case, there will necessarily be a fair amount of correspondence and travel across state lines. Defendants bemoan that the parties have had to hire local counsel here, but they do not identify a jurisdiction in which no party would have to do so. If anything, the need for local counsel weighs against transfer because the parties have already engaged local lawyers, and it would be inconvenient to start that process anew in another jurisdiction. It is also relatively easy to move documents across state lines electronically, and so the location of documents should not matter. As for witnesses, they have not yet been identified, and so it is difficult to evaluate which forum would be most convenient for them. But because of the dispersed nature of the alleged misconduct, some witnesses will inevitably have to travel. Defendants have not shown that moving the case would eliminate that, or even reliably reduce the travel burden.

At bottom, defendants' argument for a transfer is that this case should be anywhere but here, but only if they lose their motion to dismiss on the merits. That is a singularly uncompelling argument for a transfer, and the Court should reject it. The Court can always keep the door open for a transfer later if defendants can actually substantiate their claims of inconvenience and identify an appropriate alternative forum.

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1

## X.     The Rule 19 Joinder Argument Is Meritless

2

Caring Hands argues that the VA is a necessary party that must be joined in

3

this action, or the action must be dismissed, because the complaint alleges that

4

some VA contracting officers may have knowingly assisted defendants in

5

unlawfully obtaining contracts. ECF 58-1 at 24-26. Caring Hands does not cite a

6

single case holding that Federal Rule of Civil Procedure 19 requires joinder of a

7

federal agency in this circumstance, and we are not aware of any.

8

In fact, precedent goes overwhelmingly the other way. Caring Hands argues

9

"that the VA is a co-conspirator," and therefore "a necessary party." ECF No.

10

58-1 at 25. But "[i]t has long been the rule that it is not necessary for all joint

11

tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes*

12

*Corp.*, 498 U.S. 5, 7 (1990) (per curiam). This principle extends to co-

13

conspirators. *See Ward v. Apple Inc.*, 791 F.3d 1041, 1048 (9th Cir. 2015).

14

Caring Hands cites no precedent to the contrary.

15

Caring Hands' description of the VA is also wrong. The complaint alleges

16

that the VA was the victim, not a co-conspirator, and it stands to recover as a

17

result of UPPI's efforts. *E.g.*, ¶ 164. At most, some rogue contracting officers

18

may have been co-conspirators with defendants. But the VA's interests are

19

distinct from those of the rogue officers, and so their conduct does not require

20

the Court to join the VA—and certainly not as a defendant.

21

**PAUKERT & TROPPMANN, PLLC**
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1    Caring Hands is also wrong to argue that the VA must be joined as a

2 defendant so that it can defend its contracting decisions. First, this presupposes

3 that the VA agrees with defendants' characterizations of its conduct—and there

4 is no evidence of that. Second, the Government has other mechanisms to make

5 its views known: It can file statements of interest; it can intervene for good cause

6 under 31 U.S.C. § 3730(c)(3); and it is subject to third-party discovery whereby

7 it can reveal its view of the facts. Joinder is neither necessary nor appropriate to

8 allow the VA to explain or defend its contracting decisions.

9    Requiring joinder of the Government is also contrary to the FCA, which

10 permits the Government to decide whether to intervene in an action (and thereby

11 become a party) or to decline to intervene (and not be a party). *See* 31 U.S.C.

12 § 3730(b)(4). Caring Hands' position would effectively force the Government to

13 intervene against its will any time its officers arguably enabled a fraud. That is at

14 odds with the statutory scheme.

15    Finally, even if joinder of the Government as a defendant were required (and

16 it emphatically is not), it would not be feasible because the Government has

17 sovereign immunity from damages suits, and has not waived it for the FCA. *See*

18 Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* § 4:67

19 (3d ed.), Westlaw (database updated June 2020) (collecting cases). When joinder

20 is not feasible, the right course is not to dismiss the action, but instead to decide

21 whether, "in equity and good conscience, the action should proceed among the

existing parties or should be dismissed." Fed. R. Civ. P. 19(b). The relevant factors include: (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Here, these factors weigh against dismissal. The Government and the existing parties would suffer no prejudice because the Government's role in and views on the case will become known through discovery whether it is a party or not. Judgment without joining the Government as a defendant would be adequate because it would afford complete relief to UPPI. Dismissal, by contrast, would leave UPPI without a remedy. More broadly, defendants should not escape liability for a fraud that they initiated and perpetrated merely because a rogue Government employee may have been complicit. Such a rule would effectively immunize corruption from the FCA—which makes no sense.

## CONCLUSION

For the foregoing reasons, the motions to dismiss should be denied. If the Court finds any of defendants' arguments persuasive, UPPI respectfully requests leave to amend to address those points, unless amendment would be futile.

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

1    DATED this 12th day of February, 2021.

2                    PAUKERT & TROPPMANN, PLLC

3                    */s/ Kathleen H. Paukert*
                    KATHLEEN H. PAUKERT, WSBA #20247
4                    522 W. Riverside Avenue, Ste. 560
                    Spokane, Washington 99201
5                    Telephone: (509) 232-7760
                    Facsimile: (509) 232-7762
6                    Email: kpaukert@pt-law.com

7                    Tejinder Singh (pro hac vice)
                    GOLDSTEIN & RUSSELL, P.C.
8                    7475 Wisconsin Ave.
                    Suite 850
9                    Bethesda, MD 20814
                    Email: tsingh@goldsteinrussell.com

10                   *Counsel for Plaintiff-Relator*

11

12

13

14

15

16

17

18

19

20

21

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762

# **CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2021, I, KATHLEEN H. PAUKERT, electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice.

PAUKERT & TROPPMANN, PLLC

By:___*/s/ Kathleen H. Paukert*_____
KATHLEEN H. PAUKERT, WSBA NO. 20247
PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, Washington 99201
Telephone: (509) 232-7760
Facsimile: (509) 232-7762
Email: kpaukert@pt-law.com

PLAINTIFF-RELATOR'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS - 62

PAUKERT & TROPPMANN, PLLC
522 W. Riverside Avenue, Suite 560
Spokane, WA 99201
TEL: 509-232-7760 FAX: 509-232-7762